Edward F. Maluf (EM 6884)
Philip L. Blum (PB 9551)
BINGHAM McCUTCHEN LLP
399 Park Avenue
New York, New York  10022
(212) 705-7000

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DAN-FOAM A/S and TEMPUR-PEDIC, INC., | |
| Plaintiffs, | ECF CASE |
| v. | Filed Electronically |
| BRAND NAME BEDS, LLC d/b/a BRANDNAMEBEDS4LESS, | CIVIL ACTION NO. |
| Defendant, | 06 CV 6350 (SAS) |
| and | |
| BRAND NAME BEDS, LLC, | |
| Defendant/Counterclaim-Plaintiff, | |
| v. | |
| DAN-FOAM A/S and TEMPUR-PEDIC, INC., | |
| Plaintiffs/Counterclaim-Defendants. | |

**PLAINTIFFS' MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................................ 1

ARGUMENT ........................................................................................................................... 4

I.      STANDARD FOR SUMMARY JUDGMENT ................................................................. 4

II.     THE MATTRESSES SOLD BY BRAND NAME BEDS ARE NOT "GENUINE"
        TEMPUR-PEDIC PRODUCTS ...................................................................................... 5

        A.      Tempur-Pedic's Product Warranty Is A Quality Control Mechanism That
                Is Not Available To Consumers Purchasing From BNB ..................................... 6

        B.      BNB's Repackaging and Delivery Methods Do Not Comply With
                Tempur-Pedic's Quality Control Procedures ..................................................... 10

        C.      Failure to Comply with Tempur-Pedic's Legitimate Quality Control
                Mechanisms Diminishes the Valuable TEMPUR-PEDIC® Trademark ............. 10

III.    THE WARRANTY DOES NOT, AND CANNOT, ATTACH TO MATTRESSES
        SOLD BY BRAND NAME BEDS ................................................................................. 11

        A.      The Warranty Does Not Apply To Products Purchased From BNB ................... 12

        B.      BNB's Improper Repackaging and Delivery Methods Render the
                Warranty Void Well Before A BNB Consumer Receives The Mattress ............. 14

IV.     BNB INFRINGED TEMPUR-PEDIC'S MARK BEFORE AND UNTIL THIS
        SUIT WAS FILED ........................................................................................................ 15

V.      THE FIRST SALE DOCTRINE DOES NOT APPLY ................................................... 15

VI.     TORTIOUS INTERFERENCE WITH CONTRACT CLAIM IS MERITORIOUS ...... 18

CONCLUSION ....................................................................................................................... 21

i

## TABLE OF AUTHORITIES

Page

*Berger v. U.S.*, 87 F.3d 60 (2d Cir. 1996)...............................................................19, 20

*Christie's Inc. v. Dominica Holding Corp.*, No. 05 Civ. 8728 (NRB), 2006
WL 2012607 (S.D.N.Y. July 18, 2006) ......................................................4, 19

*El Greco Leather Products, Co. v. Shoe World, Inc.*, 806 F.2d 392 (2d Cir.
1986) ........................................................................................................5

*Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
756 F.2d 230 (2d Cir. 1985).......................................................................4

*Goldic Electric, Inc. v. Loto Corp., U.S.A.*, No. 00 Civ. 0028 (DC), 2000 WL
1880327 (S.D.N.Y. Dec. 28, 2000)..................................................... *passim*

*H.L. Hayden Co. of New York, Inc. v. Siemens Medical Systems, Inc.*, 879
F.2d 1005 (2d Cir. 1989).   ....................................................................18, 20

*Int'l Minerals & Resources, S.A. v. Pappas*, 96 F.3d 586 (2d Cir. 1996) ....................................20

*Kleinman v. T. Vincent*, No. 90 Civ. 5665 (LBS), 1991 WL 2804 (S.D.N.Y.
Jan. 8, 1991)..............................................................................................4

*Kronos, Inc. v. AVX Corp.*, 81 N.Y.2d 90, 595 N.Y.S.2d 931, 612 N.E.2d 289
(1993)......................................................................................................19

*Lazzarino v. Warner Brothers*, No. 602029/05, 2006 WL 3069276 (N.Y. Sup.
Oct. 30, 2006) ........................................................................................19

*Liz Claiborne, Inc. v. Mademoiselle Knitwear, Inc.*, 979 F. Supp. 224
(S.D.N.Y. 1997) ......................................................................................16

*Monsanto Co. v. Haskel Trading, Inc.*, 13 F. Supp.2d 349 (E.D.N.Y. 1998)......................4, 5, 10

*Movado Group, Inc. v. Matogardo Ventures, Inc.*, No. 98 Civ. 6223 LMM,
2000 WL 1855120 (S.D.N.Y. Dec. 19, 2000) ..............................................6, 9

*Perkins School for the Blind v. Maxi-Aids, Inc.*, 274 F. Supp.2d 319 (E.D.N.Y.
2003) ......................................................................................................6

*Prestonettes, Inc. v. Coty*, 264 U.S. 359 (1924)........................................................17

*Ryan v. Volpone Stamp Co., Inc.*, 107 F. Supp.2d 369 (S.D.N.Y. 2000) ...............................16, 17

*Sutera v.  Schering Corp.*, 73 F.3d 13 (2d Cir. 1995)..................................................20

*Swatch, S.A. v. New City, Inc.,* 454 F. Supp.2d 1245 (S.D. Fla. 2006) .........................................9

ii

TABLE OF AUTHORITIES
(continued)

Page

*Warner-Lambert Co. v. Northside Development Co.*, 86 F.3d 3 (2d Cir. 1996) ......................5, 10

## **STATUTES**

Restatement (Second) of Torts § 774A (1977) .............................................................................20

iii

Plaintiffs Dan-Foam A/S and Tempur-Pedic, Inc. (jointly, "Tempur-Pedic" or "Plaintiffs") respectfully submit this Memorandum of Law in Opposition to Defendant Brand Name Beds, LLC's[1] ("BNB") Motion for Summary Judgment, along with the accompanying Declaration of Andrew Tarter ("Tarter Decl.") and Affidavit of Edward F. Maluf ("Maluf Aff."), and Plaintiffs' Response to Brand Name Beds' Local Rule 56.1 Statement of Undisputed Material Facts.

## PRELIMINARY STATEMENT

A trademark holder has the right under the Lanham Act to control the quality of the goods sold under its trademark, irrespective of the actual quality of the goods sold under that trademark. A trademark holder can exercise this right by instituting and abiding by appropriate quality control procedures, such that sales of goods that do not conform to such procedures diminish the trademark's value. Two quality control mechanisms recognized in the Second Circuit are (i) the offering of a product warranty by the trademark holder, and (ii) the use of particular product packaging by the trademark holder. Thus, distributing a product without its warranty or without its original packaging may render the product significantly different and thus not "genuine" for purposes of the Lanham Act. BNB's sale of goods without the product warranty and/or without its original packaging forms the basis for Tempur-Pedic's trademark claim.

BNB, however, claims that this is not, as a matter of law, a cognizable theory for trademark infringement. BNB first espoused this belief at the conference with the Court on November 13, 2007. At the same conference, Tempur-Pedic explained that despite the fact that the warranty statement or card may physically accompany the goods that non-authorized vendors

---

[1] After this Complaint was filed, but prior to the first Court hearing on October 26, 2006, BNB dissolved itself as a Louisiana corporation, and is now deemed "inactive" by the Louisiana Secretary of State. *See* Maluf Aff. ¶¶ 2–5, Ex. A.

such as BNB sell, Tempur-Pedic does not grant warranty protection to products sold by them pursuant to the terms of that warranty.  The legal issue to be addressed on this motion was thus squarely framed:  Is the product warranty unavailable to BNB's customers as a matter of law, and if so, has Tempur-Pedic pled a cognizable claim for trademark infringement?

At the November 13, 2006 conference, the Court also described the parties' stipulated facts for purposes of this motion:  (i) BNB is a non-authorized vendor of products made by Tempur-Pedic; (ii) BNB delivers such products repackaged without using the original Tempur-Pedic packaging; and (iii) BNB's products are delivered with a Tempur-Pedic warranty statement or card.  Nov. 13, 2006 Hr'g Tr. at 11.  Despite the Court's framing of both the facts and the law for BNB's motion, BNB has opted, to its detriment, to forego a motion on a relatively straight-forward legal issue and make an omnibus *pre-discovery* motion for summary judgment.[2]  In doing so, BNB has gone far beyond the stipulated facts described by the Court, and has raised an array of genuine and material factual issues that require determination.

In light of the fact that there has been no meaningful discovery in this case, and that all facts must be viewed in the light most favorable to the non-moving party, BNB has not, and cannot, demonstrate that there is an absence of genuine issues of material fact in connection with these claims.  Significant material questions of fact remain whether: (1) Plaintiffs use legitimate, substantial quality control procedures; (2) Plaintiffs follow such procedures; and (3) BNB's non-conforming sales diminish the value of the mark.

BNB generally avoids the quality control issues under the Lanham Act, although they are central to the complaint filed in this action, and were central to the discussions at the November 13, 2006 conference.  Rather, BNB simply argues that it is entitled to sell these products under

---

[2]  While Tempur-Pedic has served discovery requests and BNB has served perfunctory written responses and objections, it has not produced documents.  Maluf Aff. ¶ 21.

the "first-sale" or "exhaustion" doctrine; that the warranty is broad enough to cover users of non-conforming goods; and finally, that it commits no infringement because it was not using the TEMPUR-PEDIC® trademark, but instead simply using the term "Tempur-Pedic" for descriptive purposes.

BNB cannot, as a matter of law, shield itself with the first sale doctrine.  That defense requires the sale of a genuine, unaltered product.  That is not the case here.  Further, BNB cannot prevail on its warranty language argument because Tempur-Pedic's warranty applies only to the original purchaser from Tempur-Pedic itself or its authorized retailers.  And even if the warranty could be construed as broadly as BNB suggests, BNB's customers could never qualify for the warranty (even before they ever receive the product) because of the manner in which BNB repackages and delivers Tempur-Pedic's products.  BNB folds, rolls and stuffs the mattresses into a package significantly smaller than the original product packaging, which literally punishes and imposes tremendous stress on the material that makes up the product.  This both alters and damages the product.  Under the terms of the warranty, its coverage is not available to products that have been handled in this manner.  Consequently, not only is the exhaustion defense unavailable to BNB, but also, under the clear terms of the Tempur-Pedic warranty itself, no warranty coverage is available to BNB's consumers.

Moreover, BNB in fact made liberal use of the TEMPUR-PEDIC® trademark for purposes beyond mere description of the product.  After this suit was filed, BNB suddenly changed course and now claims that its pre-suit conduct matches its post-suit behavior.  But that assertion is demonstrably false.

Finally, and in addition to moving on the trademark issue, it moves for summary judgment on the claim for tortious interference with contractual relations.  That prong of BNB's

motion should be denied as improper, premature and, as we will show, meritless on this pre-discovery motion for summary judgment.

Consequently, BNB's motion should be denied in its entirety.

## **ARGUMENT**

## I.  **STANDARD FOR SUMMARY JUDGMENT**

Summary judgment is appropriate only when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.  *Goldic Elec., Inc. v. Loto Corp., U.S.A.*, No. 00 Civ. 0028 (DC), 2000 WL 1880327, at *5 (S.D.N.Y. Dec. 28, 2000).[3]  In deciding a motion for summary judgment, the evidence submitted must be viewed in the light most favorable to the nonmoving party.  *Christie's Inc. v. Dominica Holding Corp.*, No. 05 Civ. 8728 (NRB), 2006 WL 2012607, at *2 (S.D.N.Y. July 18, 2006); *see also Monsanto Co. v. Haskel Trading, Inc.*, 13 F. Supp.2d 349, 353 (E.D.N.Y. 1998) ("In determining when material facts are in dispute, all ambiguities must be resolved and all inferences drawn in favor of the non-moving party.").

Where, as here, a motion for summary judgment is made before the moving party has produced the discovery demanded of it, "summary judgment is to be assessed only with great caution."  *Christie's*, 2006 WL 2012607 at *2 (citation omitted); *see also Kleinman v. T. Vincent*, No. 90 Civ. 5665 (LBS), 1991 WL 2804, at *1 (S.D.N.Y. Jan. 8, 1991) ("Summary judgment of a complaint prior to discovery is granted only in the clearest of cases."); *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 756 F.2d 230, 234 (2d Cir. 1985) ("Summary judgment is a drastic remedy and the harshness of this remedy is exacerbated where the non-moving party is precluded from conducting discovery.") (citation omitted).  As set forth

---

[3] All unpublished opinions referenced herein are attached hereto at Tab 1 in alphabetical order.

below, BNB is unable to meet its burden, and this motion for pre-discovery summary judgment should be denied.

## II.      THE MATTRESSES SOLD BY BNB ARE NOT "GENUINE" TEMPUR-PEDIC PRODUCTS

"One of the most valuable and important protections afforded by the Lanham Act is the right to control the quality of goods manufactured and sold under the holder's trademark.  For this purpose the actual quality of the goods is irrelevant; it is the control of quality that a trademark holder is entitled to maintain."  *El Greco Leather Prods. Co. v. Shoe World, Inc.*, 806 F.2d 392, 395 (2d Cir. 1986) (citations omitted).

The Second Circuit set out a three-part test that a trademark holder must satisfy to show infringement based on its unquestionable right to control the quality of goods sold:  "(i) it has established legitimate, substantial, and non-pretextual quality control procedures; (ii) it abides by these procedures; and (iii) the non-conforming sales will diminish the value of the mark."  *Warner-Lambert Co. v. Northside Dev. Co.*, 86 F.3d 3, 6 (2d Cir. 1996) ("Distribution of a product that does not meet the trademark holder's quality control standards may result in the devaluation of the mark by tarnishing its image.  If so, the non-conforming product is deemed for Lanham Act purposes not to be the genuine product of the holder, and its distribution constitutes trademark infringement.");  *see also Monsanto*, 13 F. Supp.2d at 356 (denying summary judgment where questions of fact arose regarding trademark holder's maintenance of quality control procedures).

Tempur-Pedic has instituted and abides by legitimate, substantial and non-pretextual quality control mechanisms that, if not followed, diminish the value of the TEMPUR-PEDIC® trademark.  The mattresses that BNB sells are not "genuine" because they do not, and cannot, comply with Plaintiffs' quality control procedures.

NYDOCS/1280669.2

A.  **Tempur-Pedic's Product Warranty Is A Quality Control Mechanism That Is Not Available To Consumers Purchasing From BNB.**

It is well-established within the Second Circuit that a product's warranty can function as a legitimate, substantial, and nonpretextual quality control procedure.  *See Perkins School for the Blind v. Maxi-Aids, Inc.*, 274 F. Supp.2d 319, 321 (E.D.N.Y. 2003) ("[Plaintiff] rightly asserts that courts have recognized warranties as a quality control mechanism"); *Goldic*, 2000 WL 1880327, at *5–6 (denying post-discovery summary judgment, noting that "a trier of fact could certainly find that defendants infringed the [plaintiff's] mark by neglecting to comply with the quality control procedures established by [plaintiffs]"); *Movado Group, Inc. v. Matogardo Ventures, Inc.,* No. 98 Civ. 6223 LMM, 2000 WL 1855120, at *4 (S.D.N.Y. Dec. 19, 2000) (denying post-discovery summary judgment where issues of fact arose concerning alleged authorization to resell products without a product warranty).  As this Court has noted, distribution of a product without its warranty can render the product "significantly different," and can constitute trademark infringement.  *Movado*, 2000 WL 1855120, at *4, n.9.  This scenario applies here

Tempur-Pedic's 20-year warranty is a distinctive feature that is rarely available to consumers purchasing mattresses or home products from any other source.  Tarter Decl. ¶ 12.  The warranty, in part, serves as a direct communication from Tempur-Pedic to consumers that Tempur-Pedic products are "of extremely high quality, that [the company] has tremendous faith in its product, and that trust can be placed in the company to stand behind its product."  *Id*.  Tempur-Pedic uses the warranty itself as a quality control mechanism.  *Id*. at ¶ 15.

This warranty, under its own terms, does not apply to products that BNB sells because of the manner in which BNB handles and ships those products.  It is restricted to Tempur-Pedic mattresses that are handled properly and used normally.  Tarter Decl. ¶¶ 14–17 (explaining that

the warranty covers "any deterioration in the cell structure of the materials that causes the mattress to have a visible indentation greater than three fourths of an inch . . . [and] . . . any physical flaw in the mattress that causes the material to split or crack *despite normal usage and proper handling* . . . [But a]ll warranties contained herein *shall not apply if the mattress . . . has been physically abused, damaged, burned, cut, or torn*") (emphasis added).  Consequently, the Tempur-Pedic warranty is not available to the products sold by BNB because of the manner in which it rolls, folds and ships the mattresses.  Tarter Decl. ¶ 27.

As Mr. Tarter explains, BNB modifies and diminishes the quality of the Tempur-Pedic products sold by their folding, rolling and repackaging the mattresses: "the proper method of storing and delivering a Tempur-Pedic mattress is to lay it flat in its original product packaging." *Id*. ¶ 24, Ex. B (showing how Tempur-Pedic stores its mattresses); *see also* Maluf Aff. ¶ 18, Ex. D (attaching image used by BNB on its eBay store and website reflecting Tempur-Pedic's original packaging with instructions to "store flat").  BNB's method of delivery, however, involves "crush[ing] the mattress by folding it into halves and quarters or by rolling it up" and "cram[ming] the . . . mattress into a cardboard box . . . ."  Tarter Decl. ¶¶ 29–30, Exs. C and D. These methods of packaging and delivery not only severely compromise Tempur-Pedic's packaging and delivery-related quality control mechanisms, but actually damage the mattresses themselves.  *Id*. ¶¶ 28–34 (explaining how BNB's repackaging process and improper delivery methods damage the product, inevitably resulting in the product's being viewed as being of lower quality or otherwise unreliable).

As explained in detail by Mr. Tarter, a seller's handling and delivery of Tempur-Pedic products is absolutely critical to ensuring that the TEMPUR Material, of which the mattresses

consist, is not damaged, and can function as intended by the time it reaches a consumer.  *See*

Tarter Decl. ¶¶ 22–26.  For example:

> [B]ecause of its temperature-sensitive nature, TEMPUR Material actually
> hardens in temperatures below 50°F . . . .  Winter deliveries throughout the
> northern half of the United States and Canada have been known to take
> significant time.  Typically, the mattress will be delivered to a home, and
> left in a convenient place while the TEMPUR Material reaches room
> temperature and softens if the mattress cannot be brought directly into the
> intended bedroom.  The delivery personnel . . . continue making their
> rounds delivering other mattresses, and will make a second stop at each
> home to finish installing the mattress in a bedroom.

*Id*. ¶¶ 22, 25.

BNB is therefore incorrect in stating that "Tempur-Pedic does not in any way regulate the

packaging in which Tempur-Pedic products are to be delivered to retail customers by authorized

dealers."  Declaration of Anthony Battaglia ("Battaglia Decl.") ¶ 26.  To the contrary, Tempur-

Pedic's "stringent packaging and delivery regulations are an integral part of ensuring quality

control over [Tempur-Pedic] products because of the potentially devastating impact that

improper packaging or delivery can have on [the] mattresses."  Tarter Decl. ¶ 26.

Moreover, mattresses sold by BNB are delivered by common carriers, such as UPS and

Federal Express, who merely leave the repackaged product at the recipient's door.  *Id*. at ¶ 33.

As a result, the BNB consumer receives no trained instruction, advice or assistance on how to

handle the mattress.

In cases similar to this one, where purchasers from unauthorized vendors do not receive

the trademark holder's warranty coverage, courts have denied summary judgment.  For example,

in *Goldic*, the defendants, unauthorized retailers, sold plaintiff's trademarked electronic Chinese-

English dictionaries to consumers without providing either the plaintiff's product warranty or

technical support services.  The *Goldic* plaintiff claimed that "[the] dictionaries sold by

defendants were not genuine goods because purchasers [did] not receive [plaintiff's] warranties,

repair, or maintenance service—critical components of [plaintiff's] quality control efforts." *Goldic*, 2000 WL 1880327, at *5. In denying defendants' motion for summary judgment on the trademark claims, this Court found that "defendants . . . do not provide warranty, repair, or maintenance services to customers purchasing [the] dictionaries. Moreover, [plaintiff] has alleged that defendants' failure to provide adequate repairs threatens the quality of the Golden Dictionary product, and consequently, the Golden Dictionary Mark." *Id.* at *6 (citations omitted). There, as here, consumers were sold trademarked products that did not conform to the trademark holder's quality control procedures, thereby threatening the quality of the product, and consequently diminishing the value of plaintiff's mark. *Id.*; *see also Movado*, 2000 WL 1855120, at *4–5 (denying summary judgment where questions of fact remained as to whether plaintiff had authorized defendants to sell its watches without a factory warranty).

BNB itself concedes that the issues it presents are genuine questions of fact that cannot be decided on summary judgment. It admits that "an examination must be conducted by the Court to determine whether the alleged differences between the Tempur-Pedic mattresses sold by Plaintiffs and those sold by Brand Name Beds are 'materially different.' *That examination involves questions of fact that cannot be resolved on summary judgment*." Defendant's Memorandum of Law ("Def. Mem.") at 16 (emphasis added). In the case relied on by BNB, the court held that determining whether the lack of warranty coverage is material to a consumer's decision to purchase a watch is a question of material fact for the jury to decide. Def. Mem. at 16 (citing *Swatch, S.A. v. New City, Inc.,* 454 F. Supp.2d 1245, 1251 (S.D. Fla. 2006)).

Because BNB does not sell products that conform to Tempur-Pedic's quality control standards, thereby threatening the quality of the Tempur-Pedic products and diminishing the value of the Tempur-Pedic mark itself, its motion for summary judgment should be denied.

**B.     BNB's Repackaging and Delivery Methods Do Not Comply
        With Tempur-Pedic's Quality Control Procedures.**

Another quality control mechanism employed by Tempur-Pedic, and recognized by the

Second Circuit, concerns the trademark holder's packaging of its products.  *See Warner-*

*Lambert,* 86 F.3d at 5–6 (affirming Judge Scheindlin's ruling that preliminarily enjoined the

defendant from selling repackaged cough drops that did not meet the trademark holder's quality

controls for packaging); *Monsanto,* 13 F. Supp.2d at 356 (denying summary judgment where

genuine issues of fact remained regarding "whether, in packaging the[ir] product, the plaintiffs

maintained quality control procedures which were undermined by the defendants' subsequent

reboxing of the product").  A trademark holder can establish infringement under the Lanham Act

if it can show:  (1) that the repackaging of its goods diminishes the quality of those goods; or

(2) that the repackaging of its goods causes a likelihood of confusion as to the source of those

goods.  *Id.* at 349.

Because BNB's repackaging and delivery methods do not comply with Tempur-Pedic's

quality control procedures, BNB diminishes the quality of the product and thereby diminishes the

quality of the TEMPUR-PEDIC® mark.  As a result, BNB's motion for summary judgment

should be denied.  *See Goldic*, 2000 WL 1880327, at *6 (denying summary judgment where "a

trier of fact could certainly find that defendants infringed the [plaintiff's] trademark by

neglecting to comply with the [plaintiff's] quality control procedures").

**C.     Failure to Comply with Tempur-Pedic's Legitimate Quality
        Control Mechanisms Diminishes the Valuable TEMPUR-
        PEDIC® Trademark.**

The Second Circuit explained in *Warner-Lambert* that distribution of a product failing to

meet the quality control standards imposed by a trademark holder "may result in the devaluation

of the mark by tarnishing its image."  86 F.3d 3, 6.  Common sense dictates that if a trademark

holder develops legitimate, substantial, and nonpretextual procedures for controlling the quality of its product, and follows its own procedures, then another party's deviation from such procedures would logically compromise the product's quality, thereby tarnishing the trademark holder's image in the mind of consumers, and thus devaluing the mark.

Mr. Tarter has explained that BNB's abusive treatment of Tempur-Pedic mattresses exposes the product to extraordinary stress and damage, so that the mattress cannot possibly last as long as or in the manner that it was intended.  *See* Tarter Decl. ¶¶ 23, 26, 28–32.  He further explains that the mattresses BNB customers receive are in such a degraded condition that the valuable and highly-regarded TEMPUR-PEDIC® brand inevitably is deemed by the consumer as being of a lesser quality than the level consumers come to expect from Tempur-Pedic, which has spent over $250 million over three years marketing the TEMPUR-PEDIC® brand and the products associated with it.  Tarter Decl. ¶ 34; Compl. ¶ 12.  Thus, BNB's failure to comply with these strict quality control procedures tarnishes the TEMPUR-PEDIC® trademark, and therefore diminishes the value of the brand.

Consequently, BNB cannot demonstrate that (1) Plaintiffs' use of legitimate, substantial quality control procedures, (2) Plaintiffs' practice of following such procedures, or (3)  the effect of BNB's non-conforming sales on the mark are not disputed facts.

## III.   THE WARRANTY DOES NOT, AND CANNOT, ATTACH TO MATTRESSES SOLD BY BNB

Tempur-Pedic's mattress warranty does not, and cannot, apply to the products that BNB sells.  First, Tempur-Pedic, as the trademark holder implementing legitimate quality control procedures, does not recognize warranties for products purchased outside of its authorized distribution network.  *See* Section III.A, *supra*.  Second, the warranty language itself cannot be read as BNB suggests to cover those purchases made from BNB.  Third, BNB's abusive

treatment of Tempur-Pedic's mattresses is conduct that voids the warranty *ab initio*, well before BNB's consumers receive the products.

      **A.**    **The Warranty Does Not Apply To Products Purchased From BNB.**

To protect the reputation of its internationally recognized brand, Tempur-Pedic uses a network of authorized retailers to sell its products, and invests a great deal of time and money in training them.  Tarter Decl. ¶¶ 3, 20.  Specifically, the authorized retailers are trained in the proper handling, delivery and use of genuine Tempur-Pedic products by Tempur-Pedic retail trainers, who provide in-store training for authorized retailers and their sales staff.  *Id*. ¶¶ 20-22.  Once a retailer is trained, a Tempur-Pedic Territory Sales Manager will conduct a follow-up visit to ensure that the retailer is properly implementing its Tempur-Pedic training.  *Id*.  If not, the authorized retailer will receive further instruction from Tempur-Pedic.  *Id*.

Tempur-Pedic makes this significant investment in time, money and attention in part so that its customers can get maximum use out of their products.  Accordingly, Tempur-Pedic is able to provide its customers a feature that adds to the quality and distinctiveness of its products, namely its 20-year warranty coverage.  *Id.* ¶ 12.  As previously stated, Tempur-Pedic provides an unusually long warranty in part to communicate to its consumers that the product is of extremely high quality and that it has tremendous faith in its product.  *Id.*  In order to be able to support such a statement about the longevity of its products, Tempur-Pedic is careful to provide a warranty that is contingent upon proper handling by all parties involved, including the authorized retailer, its delivery personnel, and the consumer.  *Id.* ¶¶ 15–17, 20–22.

As demonstrated above, Tempur-Pedic uses such an extensive warranty as a quality control mechanism.  *See* Section III.A, *supra*; Tarter Decl. ¶¶ 15–17.  Because the warranty is a quality control mechanism, it specifically does not apply if the mattress has been "physically

abused, damaged, burned, cut or torn."  Tarter Decl. ¶ 17, Ex. A.  Furthermore, Tempur-Pedic

recognizes that products that have been delivered outside of their highly trained chain of

distributors are more likely to have been abused, damaged or exposed to conditions that would

accelerate the normal wear and tear of the product and would affect its functionality before the

20-year warranty period expires.  Tarter Decl. ¶¶ 19, 23.  This is why Tempur-Pedic extends its

warranty only to products purchased through Tempur-Pedic itself or its authorized retailers.  *Id.*

¶ 19.  The Tempur-Pedic warranty states:  "If you did not purchase the mattress directly from

Tempur-Pedic International, Inc., you must provide proof of purchase for the warranty claim."

*Id.,* Ex. A.  This provision is the enforcement mechanism Tempur-Pedic uses to ensure that any

warranty claim is for a mattress that was purchased and handled properly through its authorized

distribution system.  *Id.* ¶ 19.  As such, Tempur-Pedic does not provide warranty coverage where

the consumer cannot provide a proof of purchase from an authorized retailer or Tempur-Pedic

itself.  *Id.*

Despite the quality control procedures Tempur-Pedic has in place regarding warranty

coverage, BNB argues that the Tempur-Pedic warranty attaches to the goods it sells, even though

they are not an authorized dealer, "by its own terms."  Def. Mem. at 14.  However, in support of

this argument, the only term in the warranty that BNB cites to is:  "This warranty is valid only to

the original purchaser of the product…."  Def. Mem. at 13-14.  This provision does not provide

any support for BNB's reading of the warranty.

According to BNB, because the original purchaser of the product cannot be the

authorized retailer, the term "original purchaser" means all consumer purchasers who buy a

Tempur-Pedic mattress from any source, authorized or unauthorized.  Def. Mem. at 14.  BNB

misconstrues the warranty language.  Tempur-Pedic does not argue that the term "original

purchaser of the product" means the authorized retailer.  Nor does the term "original purchaser" mean that the warranty applies to all consumer purchasers.  Rather the term "original purchaser" applies to those purchasers who are able to provide proof of purchase from authorized retailers or Tempur-Pedic itself.  Tarter Decl. ¶¶ 18–19.

In support of its tortured interpretation of the warranty language, BNB offers nothing more than conjecture and opinion.  Def. Mem. at 12–17.  On the other hand, Tempur-Pedic's Center Director, Mr. Tarter, has directly handled warranty claims and knows the requirements for warranty coverage.  Tarter Decl. ¶¶ 2–3.  He states that the Tempur-Pedic warranty applies only to the "original purchasers" of Tempur-Pedic products from Tempur-Pedic itself or its authorized retailers.  *Id.* ¶¶ 18–19.  At the very least, this raises a material issue of fact precluding summary judgment.

### B.  BNB's Improper Repackaging and Delivery Methods Render the Warranty Void Well Before A BNB Consumer Receives The Mattress.

The Tempur-Pedic warranty states that:  "[a]ll warranties contained herein shall not apply if the mattress, foundation, or cover has been physically abused, damaged, burned, cut or torn." Tarter Decl., Ex. A.  As Mr. Tarter explains, "BNB crushes the mattress, folding it into halves and quarters or by rolling it up.  Then, in order to maintain that abnormal shape for prolonged periods, BNB uses heavy duty straps and cords to tie up the mattress."  Tarter Decl. ¶ 30, Exs. B and C (photographs showing BNB-delivered mattresses).  The squeezing and folding improperly stretches the TEMPUR Material for prolonged periods, which causes stress on the cells.  *Id.* ¶ 31. Tying the mattresses with straps and cords "dig[s] into the TEMPUR Material, potentially leaving grooves and cracks in the mattress."  *Id.* ¶ 31.  And, to the extent that BNB delivers mattresses through common carriers in temperatures below 50°F, "the recipient has no

understanding that he or she should wait for the mattress to unfold without trying to pry it flat. Common carriers merely drop the unopened cardboard box at the front door." *Id*. ¶ 33. BNB's treatment of the Tempur-Pedic mattresses is contrary to the warranty's requirements and renders the warranty void *ab initio* and thus unavailable to BNB's customer. Tarter Decl. ¶¶ 17, 34.

If Tempur-Pedic were compelled in any event to warrant products that have been grossly mishandled, abused, and damaged by BNB, it would inevitably curtail its warranty period, and the number of warranty claims would increase. Tarter Decl. ¶ 34. Tempur-Pedic products would then be seen as being of a lower quality or otherwise unreliable. *Id*. It is for these reasons that the Tempur-Pedic warranty is, by its terms, limited to only Tempur-Pedic products that were (1) purchased from either Tempur-Pedic or an authorized Tempur-Pedic retailer, and (2) handled properly and used normally.

## IV.    BNB INFRINGED TEMPUR-PEDIC'S TRADEMARK

BNB misleadingly asserts that it uses the Tempur-Pedic mark "on the eBay site for the purpose of identifying genuine Tempur-Pedic products," implying that it has not used the mark in an infringing manner. Def. Mem. at 16–17. This admission fails to acknowledge that BNB prominently displayed the Tempur-Pedic logo on its website with the language "BrandNameBeds4Less" emblazoned in bold lettering across it. *See* Maluf Aff. ¶¶ 18–20; Ex. E (cached images of the Tempur-Pedic logo as displayed on the BNB site prior to this suit's filing); Compl. ¶ 27, Ex. C (image of the Tempur-Pedic logo as displayed on BNB's site at the time the Complaint was filed). Such use of the TEMPUR-PEDIC® marks with BNB's marks is a classic infringement, including false sponsorship, affiliation and approval.

## V.    THE FIRST SALE DOCTRINE DOES NOT APPLY

BNB argues that the first sale or exhaustion doctrine serves as a defense to its conduct. BNB relies mostly on non-binding authorities in support of a proposition that Tempur-Pedic does

not dispute:  where a purchaser "*does no more than stock, display, and resell* a producer's product under the producer's trademark, [it] violates no right conferred . . . by the Lanham Act." Def. Mem. at 9 (citations omitted) (emphasis added).  But this defense cannot help BNB, because it does much more than "stock, display, and resell" Tempur-Pedic's products.  BNB forces the mattresses into small cardboard boxes, thus altering the products, and ships them via common carrier rather than by properly trained personnel, without providing warranty coverage. *See* Tarter Decl. ¶¶ 28–33.

The first sale or exhaustion doctrine applies only in those instances where the defendant has first established that the first sale was authorized, and that it engages in the re-sale of "genuine" goods.  *See Liz Claiborne, Inc. v. Mademoiselle Knitwear, Inc.,* 979 F. Supp. 224, 230 (S.D.N.Y. 1997) ("The question of whether a good is genuine, however, presupposes the initial sale was authorized.").  Where the goods sold by a defendant are not "genuine," or are materially different from the trademarked goods, the first-sale doctrine is unavailable as a defense.  *See Ryan v. Volpone Stamp Co., Inc.*, 107 F. Supp.2d 369, 382 (S.D.N.Y. 2000) (articulating test for an infringement claim regarding unauthorized sales).

BNB relies on *Ryan*, which involved baseball memorabilia issued by the former Major League Baseball player, Nolan Ryan.  His genuine products were sold by the defendant, who was authorized and licensed.  After the relationship with Ryan ended, the dealer continued to sell the memorabilia without Ryan's authority and license.  The dealer claimed, unsuccessfully, that the first-sale doctrine entitled it to continue selling goods without a license.

The Court explained the applicability of the first sale doctrine:

[A] court faced with an infringement claim for unauthorized sales of a
trademarked product must perform a two-part analysis.  First, the court must
consider whether the trademark owner authorized the first sale of the goods.
Second, the court must consider whether the goods were genuine.  If the initial

sale was authorized, the court must undertake the second part of the analysis and determine whether, *as a matter of fact*, the goods which were later resold without authorization were genuine…*If the goods were not genuine, that is altered or not in keeping with the trademark owner's quality standards, a valid claim for trademark infringement is established.*

*Ryan*, 107 F. Supp.2d at 382 (emphasis added).  Thus, a defendant can successfully invoke the first-sale doctrine if the first sale was authorized, and if the subsequent sales were "genuine." Aptly, *Ryan* describes non-genuine products as goods that were altered or not in keeping with the trademark owner's quality control standards.  *Id*.

Here, the first sale, *i.e.*, the sale between the authorized dealers and BNB, was not authorized by Tempur-Pedic because the arrangement between Tempur-Pedic and its retailers precludes the sale of products to any entity that will sell products on-line.  Compl. ¶ 18.  By failing the first prong of the test set forth in *Ryan*, BNB is prevented from invoking the first sale doctrine as a defense.  Even if it could overcome the first part of the test, BNB must still show, though it cannot, that the goods it sells are "genuine," *i.e.*, not altered and in keeping with Tempur-Pedic's quality control standards.  Tempur-Pedic has shown that BNB's treatment of Tempur-Pedic mattresses results in altered, damaged products.  The products sold by BNB are not "genuine" as required by the Lanham Act.  *Ryan*, 107 F. Supp.2d at 382.

BNB also relies on *Prestonettes, Inc. v. Coty*, which is now 83 years old and was decided more than 20 years before the Lanham Act.  264 U.S. 359 (1924).  There, defendant sold repackaged goods, and clearly communicated this to consumers.  It also used the plaintiff's trademark only to indicate that the plaintiff's goods were constituents of the newly repackaged goods.  *Id*. at 369.  But the Supreme Court did not discuss the genuineness of the goods in question because the products had been properly identified as having been repackaged.  Here, at the point of sale, *i.e.*, BNB's eBay store, BNB not only fails to explain to consumers that its

products are repackaged, but it deceives consumers by indicating that the mattresses for sale are still in their original packaging, *i.e.*, "Never Been Opened." *See* Maluf Aff. Ex. F (image of BNB's eBay site stating that its Tempur-Pedic mattresses have "Never Been Opened"). This deception concerning the repackaging leaves *Prestonettes* unavailable to BNB.

Finally, BNB's reliance upon *H.L. Hayden Co. of New York, Inc. v. Siemens Med. Sys., Inc.* is also misplaced. 879 F.2d 1005, 1022–23 (2d Cir. 1989). In *Hayden*, the trademark holder claimed that the alleged infringer's unauthorized sale of its trademarked goods violated its trademark rights because it had no control over the assembly, installation, and servicing of the equipment. *Id.* The court did not find trademark infringement because it concluded, after discovery, that the conduct did not result in a material difference between the products. Thus, the court did not evaluate whether the lack of warranty constituted a material difference between the products. *Id.* at 1023–24. Even BNB recognizes that *Hayden* applies "provided that purchasers are not misled about the warranty service, and provided there is no suggestion that the manufacturer's warranty applies or that such a sale was authorized by the plaintiff." Def. Mem. at 12. At a minimum, BNB misrepresents to its consumers that the Tempur-Pedic warranty coverage is available to them because they include a warranty card with the goods they deliver.

BNB has not set forth any undisputed facts for it to rely on the first-sale or exhaustion doctrine. Consequently, the Court should reject this defense as inapplicable to BNB's conduct.

## VI.    PLAINTIFFS' TORTIOUS INTERFERENCE WITH CONTRACT CLAIM IS MERITORIOUS

During the October 26, 2006 conference, this Court granted BNB's request to make its pre-trial dispositive motion on the limited issue of whether as a matter of law, Tempur-Pedic's trademark claims are valid. However, BNB ignores this limitation and now moves to dismiss

Tempur-Pedic's claim for tortious interference with contract.  On this basis alone, the Court

should deny BNB's application.

Moreover, even if BNB's motion were considered on the merits, denial of summary

judgment on this claim is appropriate because BNB moves on the basis of its unilateral

submission of facts that have not been subject to scrutiny through discovery.  As stated in

Section II, *supra* at 3–4, in deciding a motion for summary judgment, the Court must view the

evidence submitted in the light most favorable to the nonmoving party.  *Christie's,* 2006 WL

2012607 at *2.  Despite this long-established standard, BNB offers virtually no credible basis for

its motion as to this claim.

In order to plead a claim for tortious interference with contract, a party must show four

elements:  "(1) the existence of a contract between the plaintiff and a third party; (2) the

defendant's knowledge of the contract; (3) the defendant's intentional inducement of the third

party to breach or otherwise render performance impossible; and (4) damages to the plaintiff."

*Lazzarino v. Warner Bros.*, No. 602029/05, 2006 WL 3069276, at *11 (N.Y. Sup. Ct. Oct. 30,

2006) (citing *Kronos, Inc. v. AVX Corp.*, 81 N.Y.2d 90, 94, 595 N.Y.S.2d 931, 934, 612 N.E.2d

289, 292 (1993)).  Tempur-Pedic pled all of these elements.  Compl. ¶¶ 68–71.

The only proof that BNB offers to combat these allegations is the unsupported assertion

that "Brand Name Beds does not purchase Tempur-Pedic mattresses from dealers who have

entered into such [authorized dealer] contracts with Plaintiffs."  Def. Mem. at 17–18.  But BNB

does not furnish the names of the retailers or other sources from whom it obtains Tempur-Pedic

mattresses.  It is asking this Court simply to take its word for it.  BNB cannot refuse to disclose

certain information, and then purport to characterize that same information.  At the very least,

there is an issue of fact on this point.  *See Berger v. United States*, 87 F.3d 60, 65 (2d Cir. 1996)

("[t]he nonmoving party must have 'had the opportunity to discover information that is essential to his opposition' to the motion for summary judgment.") (citation omitted*); see also Sutera v. Schering Corp.,* 73 F.3d 13, 18 (2d Cir. 1995) (reversing summary judgment entered before any discovery had taken place).

BNB contends that Tempur-Pedic's claim for tortious interference with contract should be dismissed because of a purported failure to establish the pecuniary injury necessary to the claim.  But as the Second Circuit stated in *International Minerals & Resources, S.A. v. Pappas,* "[w]ith respect to damages, '[o]ne who is liable to another for interference with a contract or prospective contractual relation is liable for damages for (a) the pecuniary loss of the benefits of the contract or the prospective relation; (b) consequential losses for which the interference is a legal cause; and (c) emotional distress or actual harm to reputation, if they are reasonably to be expected to result from the interference.'"  96 F.3d 586, 597 (2d Cir. 1996) (citing Restatement (Second) of Torts § 774A (1977)); *see also Hayden*, 879 F.2d at 1024 (acknowledging that "'actual harm to reputation' is a recoverable damage for this tort") (citation omitted).  At a minimum, Tempur-Pedic should be permitted an opportunity to demonstrate that BNB has caused it the kind of injury required by this tort, *i.e.*, direct monetary damage, harm to reputation, or any other form of injury contemplated by law.

BNB has failed to show that there are no genuine issues of material fact for trial on this point.  Therefore, its motion for summary judgment of Count VI of the Complaint should be denied.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should deny BNB's Motion for Summary Judgment

in its entirety.

Dated: New York, New York
      January 26, 2007

                      BINGHAM McCUTCHEN LLP


                      By:/s/ Edward F. Maluf
                          Edward F. Maluf (EM 6884)
                          Philip L. Blum (PB 9551)
                      399 Park Avenue
                      New York, NY  10022-4689
                      Tel: (212) 705-7000

                      *Attorneys for Plaintiffs*
                      *DAN-FOAM A/S and TEMPUR-PEDIC, INC.*

Of counsel:
      Eugenie Cesar-Fabian
      Lavanya Kilaru