UNITED STATES DISTRICT COURT
SOUTHERN  DISTRICT OF NEW YORK
------------------------------------------------------ X
                         :

**DAN-FOAM A/S AND**
**TEMPUR-PEDIC, INC.,**          :

                         :

            **Plaintiffs,**     :

                         :

       **- against -**      :

                         :

**BRAND NAMED BEDS, LLC D/B/A**  :
**BRANDNAMEBEDS4LESS,**

                         :

          **Defendant.**    :
------------------------------------------------------ X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 5/4/07

**OPINION AND ORDER**

**06 Civ. 6350 (SAS)**

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.    INTRODUCTION

       Plaintiffs Dan-Foam A/S and Tempur-Pedic, Inc. (collectively,

"Tempur-Pedic"), manufacturers and distributors of premium mattresses, pillows,

and other foam-based products, bring this action against defendant Brand Name

Beds, LLC d/b/a brandnamebedsforless ("BNB"), alleging:  (1) trademark

infringement in violation of section 32 of the Lanham Act ("the Act");[1] (2)

"palming off" in violation of section 43 of the Act;[2] (3) trademark dilution in

---

[1]     15 U.S.C. § 1114.

[2]     15 U.S.C. § 1125(a).

1

violation of section 43 of the Act;[3] (4) trademark dilution in violation of New

York General Business Law section 360-l; (5) unfair competition in violation of

New York General Business Law sections 349 and 350; and (6) tortious

interference with existing contractual relations.[4]  BNB brings counter-claims

seeking a declaratory judgment that it is not engaging in trademark infringement,

palming off, tarnishment, or unfair competition,[5] and alleging:  (1) a per se

violation of section 1 of the Sherman Act;[6]  (2) a rule of reason violation of

Section 1 of the Sherman Act;[7] and (3) common law unfair competition.[8]  BNB

now moves for summary judgment on all of Tempur-Pedic's claims.[9]  The issues

to be decided on this motion are (1) whether Tempur-Pedic's product warranty is

available to consumers who purchase TEMPUR-PEDIC® mattresses from BNB;

---

[3]     15 U.S.C. § 1125(c).

[4]     *See* Complaint ("Compl.") ¶ 1.  Although the Complaint recites
violations of sections 349, 350, and 360-l of "New York General Obligation Law,"
rather than New York General Business Law, plaintiffs surely meant to allege
violations of the appropriate sections of the New York General Business Law.

[5]     *See* Answer and Counterclaim ("Answer") ¶ 85.

[6]     15 U.S.C. § 1.

[7]     *Id.*

[8]     *See id.* ¶¶ 109-125.

[9]     *See* Defendant's Notice of Motion for Summary Judgment ¶ 1.

and (2) what effect the availability of a warranty (or lack thereof) for the

TEMPUR-PEDIC® mattresses sold by BNB has on Tempur-Pedic's claims for

trademark infringement and dilution.[10] For the reasons stated below, BNB's

motion is denied.

## II.    BACKGROUND[11]

### A.    The Parties

Dan-Foam is a Danish corporation that manufactures premium foam-

based mattresses, pillows, cushions and "other comfort products" sold under the

TEMPUR-PEDIC® trademark.[12] Tempur-Pedic is a Kentucky corporation that

manufactures, markets, licenses and distributes the above products, and is a

licensee of the TEMPUR-PEDIC® trademark.[13] BNB is a Louisiana limited

liability company that sells viscoelastic foam bedding products, including

---

[10]    See Transcript of November 13, 2006 Conference ("Tr.") at 9-10.

[11]    The facts set forth below are taken from Defendant's Statement
Pursuant to Local Rule 56.1 ("Def. 56.1"), Responses of Plaintiffs Dan-Foam and
Tempur-Pedic, Inc. to Defendant Brand Name Beds, LLC's Statement of
Undisputed Material Facts Pursuant to Local Rule 56.1 ("Pl. 56.1"), and any
underlying affidavits, declarations, and exhibits attached thereto.  Where the facts
are in dispute, all reasonable inferences have been drawn in favor of the non-
moving party, Tempur-Pedic.

[12]    Pl. 56.1 ¶ 3; see also Def. 56.1 ¶ 1.

[13]    See Pl. 56.1 ¶ 3; Def. 56.1 ¶ 2.

3

TEMPUR-PEDIC® mattresses, over the internet.[14]

### B.    Tempur-Pedic's Business and Products

#### 1.    The TEMPUR-PEDIC® Trademark, TEMPUR Material and TEMPUR-PEDIC® Mattresses

The TEMPUR-PEDIC® trademark was registered on the Principal

Register of the United States Patent and Trademark Office as United States

Trademark Registration No. 1,853,088 on September 6, 1994.[15]  The trademark is

used in connection with Tempur-Pedic's mattresses, pillows, cushions and other

---

[14]    *See* Def. 56.1 ¶¶ 26-28.  According to Tempur-Pedic, BNB dissolved itself as a Louisiana corporation on September 22, 2006, one month after Tempur-Pedic filed this suit.  *See* Pl. 56.1 ¶¶ 26, 27.  Initially, in its 56.1 Statement, BNB downplayed its role as a retailer by asserting that it sells bedding products "solely at the Ebay auction site, 'www.ebay.com,' under the vendor name Brandnamebeds," and that its own website – www.brandnamebeds4less.com – is "not currently functional and has never been functional" and is "passive."  Def. 56.1 ¶¶ 28, 32, 34.  In opposition, Tempur-Pedic noted in its 56.1 Statement that www.brandnamebeds4less.com "was functional until around the time BNB received notice of a possible lawsuit against it from Tempur-Pedic" and that "[t]he Monthly Use Chart for this website indicates that there was heavy activity from January – August 2006."  Pl. 56.1 ¶ 32.  Confronted with this evidence, BNB backpedaled and admitted that "the Internet web site located at www.brandnamebeds4less.com was operational prior to the filing of the Complaint."  12/7/06 Defendant/Counterclaim-Plaintiff's Responses to Plaintiffs First Set of Discovery Requests, Requests for Admission ¶ 5.

[15]    *See* Def. 56.1 ¶ 4.

4

comfort and bedding products.[16]  Tempur-Pedic claims that "[o]ver the last three

years, Dan-Foam and Tempur-Pedic have spent in excess of $250 million in

connection with their advertisement and promotion of products bearing the

TEMPUR-PEDIC® trademark in order to establish this trademark in the minds of

consumers as a source of high-quality bedding products."[17]

      TEMPUR-PEDIC® products are made from TEMPUR Material, a

type of viscoelastic foam that is proprietary to Tempur-Pedic.[18]  TEMPUR

Material

> conforms to each user's personal body shape, weight and
> temperature . . . . [and] consists of microscopic cells that literally
> shift position and reorganize themselves to conform to the exact
> contours, weight and temperature of a user's body.  As a person
> lies down on a Tempur-Pedic mattress, the heavier parts of the
> body, typically the hips, sink in further than the lighter parts, such
> as the feet.  As the hips sink in, the material consisting of these
> cells then rises to meet the upper thighs and lower back, and
> eventually fills any gaps along the contour of the back of the body
> . . . .
>     . . . As the material molds to the shape of the user's body,
> the body as a whole becomes supported in an anatomically correct
> position with the neck and spine in perfect alignment.
>     Thus, the pressure that a body normally applies to the back
> and neck muscles when lying down on a conventional mattress is

---

[16]     *See* Pl. 56.1 ¶ 3.

[17]     Compl. ¶ 12.

[18]     *See* Pl. 56.1 ¶ 5; Def. 56.1 ¶ 5.

evenly distributed throughout the body. Consequently, neck and back ailments can be considerably relieved.[19]

Tempur-Pedic currently sells the following mattress models, all of which carry the TEMPUR-PEDIC® trademark, and which are comprised of variously layered TEMPUR Material: The OriginalBed, The ClassicBed, The DeluxeBed, The RhapsodyBed, The CelebrityBed, and The GrandBed.[20] Tempur-Pedic also sells foundations for its mattresses, as well as mattress toppers, pillows, and cushions made from TEMPUR Material.[21] TEMPUR-PEDIC® mattresses "can last much longer than conventional products if properly handled from the moment of manufacture, through delivery to and proper usage by the customer."[22]

## 2.    Tempur-Pedic's Warranty[23]

---

[19]    1/25/07 Declaration of Andrew Tarter, Tempur-Pedic Call Center Director, Direct Sales Division ("Tarter Decl.") ¶¶ 7-9.

[20]    *See* Def. 56.1 ¶ 7; *see also* Pl. 56.1 ¶ 6.

[21]    *See* Def. 56.1 ¶ 8.

[22]    Tarter Decl. ¶ 14.

[23]    BNB cites to both the 12/8/06 Declaration of Anthony Battaglia, a Principal of BNB ("Battaglia Decl.") and Tempur-Pedic's website – "www.tempurpedic.com" – when referring to Tempur-Pedic's warranty in its 56.1 Statement. *See* Def. 56.1 ¶¶ 18-25. However, the text of the warranty reproduced at http://www.tempurpedic.com/TempurCMSVB/warranty/swedish_sleep.aspx, as of the date of this Opinion, differs somewhat from the warranty text at issue here, which is found in the "20-Year Limited Warranty" ("Warranty") attached as

6

Tempur-Pedic provides a twenty-year warranty that is "valid only to the original purchaser of the product."[24] A critical dispute at the crux of this motion for summary judgment is the meaning of "original purchaser." The parties are in disagreement as to whether consumers who have purchased TEMPUR-PEDIC® mattresses from BNB hold "valid" warranties. BNB asserts that "[t]he Limited Warranty covering Plaintiff's Tempur-Pedic branded goods extends to consumers of these products regardless of whether the product was purchased directly from Tempur-Pedic, from an authorized dealer of Tempur-Pedic products, or from an unauthorized dealer."[25] Tempur-Pedic, on the other hand, asserts that "[o]nly TEMPUR-PEDIC® Products sold directly by Tempur-Pedic or its authorized retailers are accompanied by a Limited Warranty. Any warranty claim must be accompanied by proof of purchase from an authorized retailer or Tempur-Pedic itself. The warranty is void for products that were obtained outside of the authorized network."[26] The Warranty states that if the purchaser "did not purchase

---

Exhibit ("Ex.") A (one page, one contiguous paragraph) to the Tarter Declaration.

[24]     Warranty.

[25]     Def. 56.1 ¶ 19.

[26]     Pl. 56.1 ¶ 19.

the mattress directly from Tempur-Pedic International Inc.," the purchaser "must provide proof of purchase for any warranty claim."[27]

According to Tempur-Pedic, the Warranty accompanying its authorized products is unique.[28]  For the first ten years of the warranty period, "Tempur-Pedic provides a complete warranty, followed by a declining *pro rata* recovery of the cost of a new mattress over the course of the next ten years."[29] Specifically, during the first ten years of the warranty, "your Tempur-Pedic Swedish Mattress™ will be replaced or repaired at our option, without cost to you, should it be deemed defective because of faulty workmanship or structural defects."[30]  During the final ten years of the warranty, Tempur-Pedic will "at our option, repair the mattress at a handling cost to you, or replace the mattress at a prorated charge to you;" this charge is fifty percent of the original purchase price during the first year of the pro-rated period, and increases by five percent each subsequent year until the expiration of the warranty period.[31]  According to the

---

[27]    Warranty.

[28]    *See* Tarter Decl. ¶ 12.

[29]    Tarter Decl. ¶ 13.

[30]    Warranty.

[31]    *Id.*

8

Warranty, its coverage is voided if "inappropriate manufacturers' foundations or box springs" are substituted for the "firm, wood, completely flat, non-spring foundations" that TEMPUR-PEDIC® mattresses have been "designed to work with," or if "the mattress, foundation, or cover has been physically abused, damaged, burned, cut or torn."[32]

Tempur-Pedic argues that "there are few, if any, other mattress and home product manufacturers that provide such extensive warranty protection for their products."[33] As such, "[b]y providing a lengthy warranty period, Tempur-Pedic is communicating that its product is of extremely high quality," thus "enhancing the TEMPUR-PEDIC® brand itself."[34]

### 3. Tempur-Pedic's Authorized Network, Quality Control Practices, and Retailer Agreement

Tempur-Pedic maintains an "authorized network" of sellers for its TEMPUR-PEDIC® products.[35] This network includes Tempur-Pedic itself, physicians and other health care professionals, general bedding retailers, and other

---

[32]   *Id.*

[33]   Tarter Decl. ¶ 12.

[34]   *Id.*

[35]   Tarter Decl. ¶ 19.

9

retailers such as Brookstone.[36]  To ensure quality control throughout this network, Tempur-Pedic monitors these retailers and trains their staff on the proper use and care of Tempur-Pedic's products; the retailers are instructed to pass this information on to consumers.[37]  Territory Sales Managers visit authorized retailers' stores after initial retail training in order to "ensure that retailers in each sales territory incorporate the Tempur-Pedic training and are actually providing correct information to consumers."[38]

Authorized Tempur-Pedic retailers and shippers are also trained in the proper delivery and handling of TEMPUR-PEDIC® mattresses, as the TEMPUR Material is sensitive to heat and cold and can be damaged if not handled properly.[39]  Specifically, "the proper method for storing and delivering a Tempur-Pedic mattress is to lay it flat in its original product packaging."[40]  Because the TEMPUR material stiffens in temperatures below fifty degrees Fahrenheit, if Tempur-Pedic's mattresses are folded during cold-weather delivery or installation,

---

[36]  *See id*; *see also* Def. 56.1 ¶ 9.

[37]  *See* Tarter Decl. ¶¶ 20-21.

[38]  *Id.* ¶ 21.

[39]  *See id.* ¶¶ 22-26.

[40]  *Id.* ¶ 24.

10

and then forced flat while still in the stiffened state, the TEMPUR Material becomes "permanently damaged" such that the mattress can no longer "be expected to function as intended for the life of the warranty."[41]  In order to prevent this permanent damage from occurring, "[a]uthorized delivery personnel know upon arriving to a customer's home, where the mattress needs to be folded in order to fit around a corner or up a staircase, that they should wait a few hours before finishing the delivery so that the mattress can soften and can thus be *briefly* folded with the top side of the mattress inwards."[42]  During winter deliveries in the Northern United States and Canada, authorized delivery personnel for Tempur-Pedic will first place a new, packaged mattress in the consumer's home for a few hours so that it softens, then "continue making their rounds delivering other mattresses," and will finally "make a second stop at each home to finish installing the mattress in a bedroom" once the mattress has warmed.[43]

Between 2004 and 2006, only some of Tempur-Pedic's authorized retailers had signed agreements with Tempur-Pedic.[44]  Beginning in 2006,

---

[41]     *Id.* ¶¶ 22-24.

[42]     *Id.* ¶ 24.

[43]     *Id.* ¶ 25.

[44]     *See* Pl. 56.1 ¶ 12.

11

Tempur-Pedic "implemented a program to transition all of its authorized retailers to execute new written agreements"[45] that include a provision requiring the retailers to agree "not to resell Products to any other dealer or to resell Products to anyone other than end-users of Products."[46]  To date, not all of the retailers in Tempur-Pedic's authorized network have entered into this new Retailer Agreement.[47]

### C.    Brand Name Beds's Business and Alleged Trademark Infringement and Dilution

BNB is not an authorized TEMPUR-PEDIC® retailer.  Nevertheless, BNB sold TEMPUR-PEDIC® mattresses and pillows, non-TEMPUR-PEDIC® viscoelastic foam bedding products, and related bedding products including mattress foundations[48] on the Ebay auction website under the vendor name

---

[45]     Tarter Decl. ¶ 37. *See also* Tempur-Pedic Retail, Inc. Retailer Agreement ("Retailer Agmt."), Ex. E to Tarter Decl.

[46]     Retailer Agmt., at 1 ¶ 1.1.

[47]     *See* Def. 56.1 ¶ 14; Pl. 56.1 ¶ 14.  BNB asserts that "[m]any of the retailers in Plaintiffs' national network of 'authorized' dealers have not entered into" this Retailer Agreement.  Def. 56.1 ¶ 13.  Tempur-Pedic disputes this by asserting that "[a] majority of Tempur-Pedic's 2,000+ authorized retailers have signed written agreements, some since 2004 . . . and all retailers nationally are being transitioned to [the] new form of written agreement as a result of efforts undertaken by the company starting in 2006."  Pl. 56.1 ¶¶ 12-13.

[48]     *See* Def. 56.1 ¶ 27.

12

"Brandnamebeds."[49]  The TEMPUR-PEDIC® mattresses that BNB sold were accompanied by warranty cards that contained the text of Tempur-Pedic's Warranty.[50]

BNB also maintains a website at www.brandnamebeds4less.com ("brandnamebeds4less.com").[51]  This website now states that it is "Currently Under NEW Construction."[52]  Additionally, the site provides a link to BNB's Ebay store and lists BNB's telephone number and email address.[53]  Before this lawsuit was filed, BNB's website and Ebay store both displayed images of the TEMPUR-PEDIC® design mark and trademark "with the text 'BrandNameBeds4Less' in bold lettering emblazoned across it, and 'BRANDNAMEBEDS4LESS' placed between the logo and the Tempur-Pedic instruction to store the mattress 'flat.'"[54]

---

[49]     *See id.* ¶ 28.

[50]     *See* Tr. at 11.  Tempur-Pedic asserts that it does not recognize these warranty cards. *See id.* at 10.

[51]     *See* Def. 56.1 ¶ 31.

[52]     *Id.* ¶ 33

[53]     *See id.* ¶ 35. *See supra* note 14 regarding the parties' dispute over whether brandnamebeds4less.com was ever an "active" website.

[54]     1/25/07 Affidavit of Edward F. Maluf ("Maluf Aff."), Plaintiffs' Counsel, ¶ 18. *See also* Cached Image from www.brandnamebeds4less.com and Brand Name Beds for Less Ebay Store ("Cached Image"), page NSI00005 of Ex. E to Maluf Aff.  By way of explanation, BNB asserts that it only "uses the Tempur-

13

As of January 17, 2007, the above-described images on BNB's Ebay store had been replaced by "large block text reading 'LOOK HERE' or 'SAVE BIG.'"[55]

BNB purchases the TEMPUR-PEDIC® products that it sells from retailers who are part of Tempur-Pedic's authorized network.[56] Although BNB has not yet disclosed the identity of the dealers from whom it purchases its TEMPUR-PEDIC® products, it asserts that it "purchases Tempur-Pedic branded goods from dealers who have not entered into an agreement with Plaintiffs which prohibits them from selling Tempur-Pedic branded goods to other dealers,"[57] and therefore "[t]he dealers who sell Tempur-Pedic branded goods to Brand Name Beds are not in breach of any contract with either of the Plaintiffs."[58]

As a means of reducing shipping costs, BNB ships TEMPUR-PEDIC® mattresses in shipping crates or cardboard boxes that are smaller than the boxes in which Tempur-Pedic ships its mattresses and in which the mattresses are

---

Pedic name on the Ebay website to identify genuine Tempur-Pedic products" and that "[t]he Tempur-Pedic name is not used to identify products other than genuine Tempur-Pedic products." Def. 56.1 ¶ 30.

[55]     Maluf Aff. ¶ 17.

[56]     *See* Battaglia Decl. ¶ 23.

[57]     Def. 56.1 ¶ 36.

[58]     *Id.* ¶ 37.

14

first delivered to BNB.[59]  For example, BNB has shipped queen-sized TEMPUR-

PEDIC® mattresses in cardboard boxes that measure "approximately 20"(h) x

24"(w) x 34"(l), or 18"(h) x 25"(w) x 32"(l), i.e. the size of a bed chest."[60]  In

order to fit the mattresses into boxes of this size, BNB folds the mattresses in

halves or quarters, or rolls them, and then ties the mattresses up using heavy duty

straps or cords.[61]  According to Tempur-Pedic, when the mattresses are "squeezed

---

[59]     *See id.* ¶ 41.  *See also* Pl. 56.1 ¶ 42.  BNB asserts that "[t]he use by
Brand Name Beds of shipping crates for Tempur-Pedic mattresses that are smaller
than the shipping crates in which Tempur-Pedic mattresses are shipped to Brand
Name Beds is not in contravention to any regulation and / or restriction issued by
Plaintiffs," and that "Plaintiffs do not in any way regulate the packaging in which
Tempur-Pedic mattresses are to be delivered to retail consumers by its authorized
dealers." Def. 56.1 ¶¶ 42-43.  Tempur-Pedic maintains, however, that "Tempur-
Pedic has stringent packaging and delivery regulations which are an integral
quality control device for Tempur-Pedic products," and that these regulations
include the "proper method[] of storing and delivering its mattresses, which [is]
that they should be laid flat in their original product packaging," a regulation that
BNB's packaging and shipping practices "directly contravene[]." Pl. 56.1 ¶ 42.  In
further support of its contention that its packaging and shipping methods do not
contravene the methods used by Tempur-Pedic, BNB asserts that "[f]or years,
Tempur-Pedic beds were vacuum-packed and shipped to customers in much
smaller shipping crates than those in which they are currently shipped." Def. 56.1
¶ 44.  Tempur-Pedic contends that it "has not shipped its mattresses in smaller
containers than those it uses now." Pl. 56.1 ¶ 44.

[60]     Pl. 56.1 ¶ 42.

[61]     *See* Tarter Decl. ¶ 30.  For comparison, photographs attached as Ex. B
to the Tarter Declaration show TEMPUR-PEDIC® mattresses in Tempur-Pedic's
authorized shipping boxes.  Photographs attached as Exs. C and D to the Tarter
Declaration show TEMPUR-PEDIC® mattresses folded or rolled up for shipment
by Brand Name Beds.

15

and folded" for shipping in this way, "the TEMPUR Material is improperly stretched for prolonged periods . . . causing stress on the cells."[62]

Further, because BNB uses carriers other than those used by Tempur-Pedic to deliver the mattresses,[63] and because these carriers drop BNB's boxes off at customers' front doors without assisting the customers in setting up the mattresses,[64] the delivery procedures that Tempur-Pedic designed as a means of preventing the "potentially devastating impact that improper packaging or delivery can have on the mattress" are never implemented.[65]  BNB's delivery method also raises the possibility that customers who receive TEMPUR-PEDIC® mattresses shipped by BNB in temperatures lower than fifty degrees Fahrenheit will attempt prematurely to flatten the stiffened mattresses, "thus causing cracking, splitting and other damage to the cells contained within the TEMPUR Material."[66]

---

[62]     *Id.*

[63]     *See* Battaglia Decl. ¶ 26.

[64]     *See* Tarter Decl. ¶ 33.

[65]     Pl. 56.1 ¶ 42.

[66]     Tarter Decl. ¶ 33.  BNB asserts that it "does not modify, alter, or change any of the Tempur-Pedic products it buys before it sells them to consumers," and that "Tempur-Pedic products sold by Brand Name Beds are identical in all respects to those sold by Plaintiffs and all other Tempur-Pedic dealers." Def. 56.1 ¶¶ 38-39.  This may be true until the point of online sale, but Tempur-Pedic asserts that "[t]ransforming the mattress as BNB does into a folded

## III.   LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[67]  An issue of fact is genuine "'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"[68]  A fact is material when it "'might affect the outcome of the suit under the governing law.'"[69]  "It is the movant's burden to show that no

_____

and crushed capsule, and stuffing it into a small cardboard box, is a modification, alteration and change of the product" such that even if Tempur-Pedic's warranty *did* apply to TEMPUR-PEDIC® mattresses bought from non-authorized dealers, BNB's treatment of the mattresses for packaging and shipping purposes constitutes "physical[] abuse[]" or "damage[]" under the Warranty such that "any warranty protection would be void in any event." Pl. 56.1 ¶¶ 38-39. Thus, in addition to arguing that its Warranty does not apply to the products sold by BNB, Tempur-Pedic flatly rejects BNB's claim that the TEMPUR-PEDIC® mattresses sold by BNB "are identical in all respects to those sold by Plaintiffs." *Id.* ¶ 39.

[67]    Fed. R. Civ. P. 56(c).

[68]    *Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006) (quoting *Stuart v. American Cyanamid Co.*, 158 F.3d 622, 626 (2d Cir. 1998)).

[69]    *Bouboulis v. Transport Workers Union of Am.*, 442 F.3d 55, 59 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986)).

genuine factual dispute exists."[70]

In turn, to defeat a motion for summary judgment, the non-moving party must raise a genuine issue of material fact. To do so, it must do more than show that there is "'some metaphysical doubt as to the material facts,'"[71] and it "'may not rely on conclusory allegations or unsubstantiated speculation.'"[72] However, "'all that is required [from a nonmoving party] is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial.'"[73]

In determining whether a genuine issue of material fact exists, the court must construe the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in that party's favor.[74] However, "[i]t is a

---

[70]    *Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)).

[71]    *McClellan*, 439 F.3d at 144 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

[72]    *Jeffreys*, 426 F.3d at 554 (quoting *Fujitsu Ltd. v. Federal Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2002)).

[73]    *McClellan*, 439 F.3d at 144 (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968)).

[74]    *See Allstate Ins. Co. v. Hamilton Beach/Proctor Silex, Inc.*, 473 F.3d 450, 456 (2d Cir. 2007) (citing *Stern v. Trustees of Columbia Univ.*, 131 F.3d 305, 312 (2d Cir. 1997)).

18

settled rule that '[c]redibility assessments, choices between conflicting versions of

the events, and the weighing of evidence are matters for the jury, not for the court

on a motion for summary judgment.'"[75]  Summary judgment is therefore

inappropriate "if there is any evidence in the record that could reasonably support

a jury's verdict for the non-moving party."[76]  Further, the Second Circuit has noted

that "[d]isputes between parties as to trade-mark validity and infringement can

rarely be determined satisfactorily on a motion for summary judgment."[77]

## IV.   APPLICABLE LAW

### A.   Trademark Infringement Under the Lanham Act

Section 32(1) of the Lanham Act governs claims for infringement of

a registered trademark, prohibiting the use in commerce of "any reproduction,

counterfeit, copy, or colorable imitation of a registered mark in connection with

the sale, offering for sale, distribution, or advertising of any goods or services on

or in connection with which such use is likely to cause confusion, or to cause

---

[75]     *McClellan*, 439 F.3d at 144 (quoting *Fischl v. Armitage*, 128 F.3d 50,
55 (2d Cir. 1997)).  *Accord Anderson,* 477 U.S. at 249.

[76]     *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002)
(citing *Pinto v. Allstate Inc. Co.*, 221 F.3d 394, 398 (2d Cir. 2000)).

[77]     *Marcus Breier Sons v. Marvlo Fabrics*, 173 F.2d 29, 29 (2d Cir.
1949).  *Accord Frederick Warne & Co., Inc. v. Book Sales Inc.*, 481 F. Supp. 1191
(S.D.N.Y. 1979).

mistake, or to deceive."[78]

Section 43(a) of the Act[79] governs claims for infringement of an

unregistered trademark and also acts as "a broad federal unfair competition

provision."[80]  Accordingly, "[w]here there is a claim of consumer confusion [as] to

the association of a product or service with another person's trademark, the central

inquiry is whether it is likely that 'an appreciable number of ordinarily prudent

purchasers' will be misled as to the source or sponsorship of the product or service

in question."[81]

    "A claim of trademark infringement, whether brought under [section

32(1) or 43(a) of the Act], is analyzed under the familiar two-prong test . . . . The

test looks first to whether the plaintiff's mark is entitled to protection, and second

---

[78]     15 U.S.C. § 1114(1).

[79]     *See* 15 U.S.C. § 1125(a)(1)(A).

[80]     *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 155 (2d Cir. 2002).
Specifically, section 43(a) prohibits the use in commerce of "any word, term,
name, symbol, or device, or any combination thereof, or any false designation of
origin, false or misleading description of fact, or false or misleading representation
of fact, which . . . is likely to cause confusion, or to cause mistake, or to deceive as
to the affiliation, connection, or association of such person with another person, or
as to the origin, sponsorship, or approval of his or her goods, services, or
commercial activities by another person." 15 U.S.C. § 1125(a)(1)(A).

[81]     *Chambers*, 282 F.3d at 155 (quoting *EMI Catalogue P'ship v. Hill,
Holiday, Connors, Cosmopulos Inc.*, 228 F.3d 56, 61-62 (2d Cir. 2000)).

to whether defendant's use of the mark is likely to cause consumers confusion as to the origin or sponsorship of the defendant's goods."[82]  A certificate of registration of plaintiff's trademark on the principal register is prima facie evidence that plaintiff's mark satisfies the first prong of the test.[83]  In order to determine whether a defendant's use of a mark is likely to cause consumer confusion, courts in the Second Circuit typically engage in a weighing analysis using the eight *Polaroid* factors set out by Judge Henry Friendly, which are:  (1) the strength of plaintiff's mark; (2) the similarity of plaintiff's and defendant's marks; (3) the proximity of the products; (4) the likelihood that plaintiff will "bridge the gap;" (5) actual confusion between products; (6) defendant's good or bad faith in adopting the mark; (7) the quality of defendant's product; and (8) the

---

[82]     *Virgin Enters. Ltd. v. Nawab*, 335 F.3d 141, 146 (2d Cir. 2003) (citing *Gruner + Jahr USA Publ'g v. Meredith Corp.*, 991 F.2d 1072 (2d Cir. 1993) and *Time, Inc. v. Petersen Publ'g Co. L.L.C.*, 173 F.3d 113, 117 (2d Cir. 1999)). *Accord Louis Vuitton Malletier v. Dooney & Bourke, Inc.,* 454 F.3d 108, 115 (2d Cir. 2006).

[83]     *See* 15 U.S.C. § 1057(b) ("A certificate of registration of a mark upon the principal register provided by this chapter shall be prima facie evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce . . . .").

sophistication of the buyers.[84]  However, "[n]o single factor is dispositive, nor is a

court limited to consideration of only these factors."[85]  "Further, 'each factor must

be evaluated in the context of how it bears on the ultimate question of likelihood

of confusion as to the source of the product.'"[86]

### B.    Trademark Dilution Under the Lanham Act

####     1.    Dilution under the Trademark Dilution Revision Act of 2006 ("TDRA")[87]

---

[84]    *See Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir. 1961).

[85]    *Brennan's, Inc. v. Brennan's Restaurant, L.L.C.,* 360 F.3d 125, 130 (2d Cir. 2004) (citing *Polaroid*, 287 F.2d at 495).

[86]    *Id.* (quoting *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 872 (2d Cir. 1986)).

[87]    *See* 15 U.S.C. § 1125(c).  The TDRA became effective on October 6, 2006, replacing the Federal Trademark Dilution Act of 1996 ("FTDA").  Specific changes to federal dilution law under the TDRA include the establishment of a "likelihood of dilution" standard for dilution claims, rather than an "actual dilution" standard; a provision that non-inherently distinctive marks may qualify for protection; a reconfiguration of the factors used to determine whether a mark is famous for dilution purposes, including a rejection of dilution claims based on "niche" fame; the specification of separate and explicit causes of action for dilution by blurring and dilution by tarnishment; and an expanded set of exclusions.  This lawsuit was filed on August 21, 2006, several months before the effective date of the TDRA.  Under the TDRA, Tempur-Pedic would be entitled only to injunctive relief on its dilution claim, and not to the other remedies set forth in sections 1117(a) and 1118 of title 15 of the United States Code. *See* 15 U.S.C. § 1125(c)(5). *See also Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 477 F.3d 765, 766 (2d Cir. 2007) (holding that the TDRA prospectively applied to a claim filed before the statute went into effect "to the extent that [the plaintiff]

### a.   Likelihood of Dilution

Under the TDRA, "the owner of a famous mark . . . shall be entitled

to an injunction against another person who, at any time after the owner's mark

has become famous, commences use of a mark or trade name in commerce that is

*likely to cause dilution* by blurring or dilution by tarnishment of the famous mark,

*regardless of the presence or absence of actual or likely confusion, of competition,*

*or of actual economic injury.*"[88]   The TDRA's establishment of a "likelihood of

dilution" standard rejects the "actual dilution" standard set out by the Supreme

Court in *Moseley v. V Secret Catalogue, Inc.*[89]

---

has sought *injunctive relief* on the issue of dilution") (emphasis added).  To the
extent that Tempur-Pedic seeks monetary relief for its dilution claim, the FTDA
standard for obtaining remedies other than injunctive relief still governs.  *See*
*Malletier v. Dooney & Bourke, Inc.*, No. 04 Civ. 2990, 2007 WL 1222589, at *3-4
(S.D.N.Y. Apr. 24, 2007) ("The second sentence of subsection 1125(c)(5),
entitling owners of famous marks to dilution damages, contains an unambiguous
date restriction that authorizes the application of the 'likelihood of dilution'
standard as a basis for recovering damages to civil actions where the diluting mark
or trade name was first introduced in commerce *after October 6, 2006* . . . .
Congress did not intend that the relaxed evidentiary standard would apply
retroactively.").  Under the FTDA, in order to obtain the remedies set forth in
section 1117(a) of title 15 of the United States Code, Tempur-Pedic must still
show *actual dilution*, in addition to the wilfulness requirement retained by the
TDRA, for claims of monetary relief.  *See id.* at *2, *3.

[88]    15 U.S.C. § 1125(c)(1) (emphasis added).

[89]    537 U.S. 418, 433 (2003) (holding that the text of the FTDA
"unambiguously requires a showing of actual dilution, rather than a likelihood of

23

### b.     Fame

For a trademark owner to establish the fame requirement of a dilution

claim, the mark must be "widely recognized by the general consuming public of

the United States as a designation of source of the goods or services of the mark's

owner."[90]  The TDRA sets out four factors that courts may use in "determining

whether a mark possesses the requisite degree of recognition" to be considered

"famous."[91]  These factors are: "[1] [t]he duration, extent, and geographic reach of

advertising and publicity of the mark, whether advertised or publicized by the

_____

dilution.").

[90]     15 U.S.C. § 1125(c)(2)(A).  The FTDA did not contain the phrase
"widely recognized by the general consuming public of the United States" in its
definition of "famous."  Its inclusion in the TDRA was  intended to reject dilution
claims based on "niche" fame, *i.e.* "fame limited to a particular channel of trade,
segment of industry or service, or geographic region." *Christopher D. Smithers
Found., Inc. v. St. Luke's-Roosevelt Hosp. Ctr.,* No. 00 Civ. 5502, 2003 WL
115234, at *5 (S.D.N.Y. Jan. 13, 2003).  BNB has not contested the geographic
reach of the TEMPUR-PEDIC® mark, and the issue of "niche" fame is not
implicated. Therefore, use of the TDRA's fame factors in analyzing Tempur-
Pedic's dilution claim for non-injunctive relief does not implicate the same
retroactivity question raised by use of the changed standard of proof for dilution
claims.  The Second Circuit's requirement that "the senior mark [must] be truly
famous before a court will afford the owner of the mark the vast protections of the
FTDA" remains unchanged by the TDRA's reconfiguration of the fame factors to
reject both "niche" fame and the requirement of inherent distinctiveness. *Savin
Corp. v. Savin Group*, 391 F.3d 439, 449 (2d Cir. 2004).

[91]     15 U.S.C. § 1125(c)(2)(A).

owner or third parties; [2] [t]he amount, volume, and geographic extent of sales of goods or services offered under the mark; [3] [t]he extent of actual recognition of the mark; [4] [w]hether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register."[92]

### c.    Tarnishment

"The sine qua non of tarnishment is a finding that plaintiff's mark will suffer negative associations through defendant's use."[93]  Although case law suggests that a mark is tarnished where "its likeness is placed in the context of sexual activity, obscenity, or illegal activity," this list of categories is not exhaustive.[94]  The Second Circuit has expressly held that "tarnishment is not limited to seamy conduct."[95]  Thus, the law in this Circuit takes a "broad view of tarnishment" which does not appear to have been narrowed by the TDRA.[96]

---

[92]    *Id.*

[93]    *Hormel Foods Corp. v. Jim Henson Prods., Inc.*, 73 F.3d 497, 507 (2d Cir. 1996). *Accord New York Stock Exch., Inc. v. N.Y., N.Y. Hotel, LLC*, 293 F.3d 550, 558 (2d Cir. 2002).

[94]    *Hormel*, 73 F.3d at 507 (citations omitted) (noting that "tarnishment is not limited to seamy conduct.").

[95]    *Id.* (citations omitted).

[96]    *Id.* Because the definition of tarnishment in the TDRA is not substantively different from Second Circuit tarnishment law under the FTDA, I use the language of the TDRA in discussing tarnishment as it applies to Tempur-

## 2.    Actual Dilution under the FTDA

Because the TDRA's relaxed likelihood of dilution standard applies

only to pre-October 6, 2006 claims seeking prospective relief, actual dilution

under *Moseley* still applies when a pre-October 6, 2006 claimant seeks monetary

relief.[97]  Under *Moseley*, the actual dilution requirement "does not mean that the

consequences of dilution, such as an actual loss of sales or profits, must also be

proved."[98]  While the Court did not give further guidance as to what *would* be

required in order to prove actual dilution, the Court did note that "[i]t may well be

. . . that direct evidence of dilution such as consumer surveys will not be necessary

if actual dilution can reliably be proved through circumstantial evidence – the

obvious case is one where the junior and senior marks are identical."[99]  The

Second Circuit has interpreted this to mean that "where a plaintiff who owns a

famous senior mark can show the commercial use of an identical junior mark, such

a showing constitutes circumstantial evidence of the actual-dilution element of an

-------------

Pedic's claim under both the TDRA and the FTDA.

    [97]    *See Starbucks*, 477 F.3d at 766.  *See also Malletier*, 2007 WL
1222589, *2-3.

    [98]    537 U.S. at 433.

    [99]    *Id.* at 434.

FTDA claim."[100]  Thus, true identity between marks "establish[es] per se evidence
of actual dilution."[101]

## C. Likelihood of Confusion and Dilution by Tarnishment in "Gray Goods" Cases

The term "grey market goods" "refers to a fact pattern in which

someone other than the designated exclusive United States importer buys genuine

trademarked goods outside the U.S. and imports them for sale in the U.S. in

competition with the exclusive U.S. importer."[102]  Much of the body of trademark

law that has developed around "gray goods" cases can be applied by analogy to

sales by unauthorized United States retailers of goods bearing genuine trademarks

that have been created by a trademark owner for the United States market.[103]  In a

---

[100]     *Savin*, 391 F.3d at 452.

[101]     *Id.* at 453.  For example, "a store owner who loses a 7-Eleven
franchise yet continues to use the famous '7-Eleven' mark, in so doing, violates
the FTDA and may be enjoined thereunder from using the mark." *Id.* at 452-53.

[102]     J. Thomas McCarthy, 5 *McCarthy on Trademarks and Unfair
Competition* § 29:46 (4th ed. 2007).  *Accord K Mart Corp. v. Cartier, Inc.*, 486
U.S. 281, 281 (1988) ("A gray-market good is a foreign-manufactured good,
bearing a valid United States trademark, that is imported without the consent of
the U.S. trademark holder.").

[103]     Both the Third and Eleventh Circuits have used this legal analogy.
*See Davidoff & CIE, S.A. v. PLD Intern. Corp.,* 263 F.3d 1297, 1302 (11th Cir.
2001); *Iberia Foods Corp. v. Romeo*, 150 F.3d 298 (3rd Cir. 1998).  In *Iberia*, the
Third Circuit noted that while the need for protection against "the sale of products
containing the owner's authentic mark when the products offered for sale are

27

typical gray goods trademark case,[104] a cause of action for trademark infringement

---

similar but not identical to those offered by the trademark owner . . . has arisen
most often in the context of so-called 'gray goods' cases[,] . . . [t]he scope of the
action is not limited to gray goods cases . . . . The same theory has been used to
enjoin the sale of domestic products in conditions materially different from those
offered by the trademark owner." *Id*. at 302.  Because of the legal similarity of
these two categories of goods – unauthorized foreign imports and unauthorized
domestic goods – I will refer to both as "gray goods."

[104]    Because gray goods cases typically involve foreign imports,
trademark owners generally bring actions under both the Lanham Act and section
526 of the Tariff Act.  "Tariff Act § 526(a) prohibits absolutely the importation of
a product 'that bears a trademark owned by a citizen of … the United States and is
registered in the U.S. Patent and Trademark Office.'" 5 McCarthy § 29:49.
However, the Bureau of Customs and Border Protection has also created an
exception to the above prohibition – the *Lever* Rule, based on its interpretation of
a D.C. Circuit opinion – that gives protection against customs seizure to importers
of materially different gray goods if the importers properly label the gray goods so
as to prevent consumer confusion. *See Lever Bros. Co. v. U.S.* ("*Lever Bros. II*")
981 F.2d 1330, 1338 (D.C. Cir. 1993) (holding that section 42 of the Lanham Act
"bars the importation of physically different foreign goods bearing a trademark
identical to a valid U.S. trademark, regardless of the trademark's genuine character
abroad or affiliation between the producing firms"); 19 C.F.R. § 133.23(b)
(providing that "[g]oods determined by the Customs Service to be physically and
materially different . . . bearing a genuine mark applied under the authority of the
U.S. owner . . . shall not be detained . . . where the merchandise or its packaging
bears a conspicuous and legible label designed to remain on the product until the
first point of sale to a retail consumer in the United States stating that: 'This
product is not a product authorized by the United States trademark owner for
importation and is physically and materially different from the authorized
product.'  The label must be in close proximity to the trademark as it appears in its
most prominent location on the article itself or the retail package or container.
Other information *designed to dispel consumer confusion* may also be added.")
(emphasis added).

28

or dilution arises when (1) "material differences"[105] exist between the goods sold

by the trademark holder and its authorized or licensed dealers and those sold by

the unauthorized dealer, and (2) the unauthorized dealer sells the materially

different trademarked goods  in a manner that would be likely to cause consumer

confusion, and/or dilute the strength of the trademark owner's mark.[106]  The

purpose of allowing Lanham Act claims based on material differences between

products that are and are not authorized for sale in the United States, is to uphold

"'the two fundamental policies of trademark law:  to protect the consumer and to

safeguard the goodwill of the producer.'"[107]

Gray goods cases, however, do not fit easily into the Lanham Act's

specified causes of action for infringement.  As such, courts have developed

various doctrines, including the "material differences" standard and the "quality

control" theory of infringement, as a means of shoe-horning trademark owners'

---

[105]     The "material differences" standard is defined in detail *infra* at Part
IV.C.1.

[106]     *See generally Original Appalachian Artworks, Inc. v. Granada
Elecs., Inc.*, 816 F.2d 68 (2d Cir. 1987).

[107]     *SKF USA Inc. v. International Trade Com'n*, 423 F.3d 1307, 1313
(Fed. Cir. 2005) (quoting *Gamut Trading Co. v. International Trade Com'n*, 200
F.3d 775, 782 (Fed. Cir. 1999)).

complaints in these cases into the existing Lanham Act provisions.[108]  Further,

although courts have typically addressed gray goods cases under the umbrella of

likelihood of confusion, because such cases generally involve elements of both

consumer confusion *and* dilution of a trademark's strength and goodwill, courts

must engage in the separate analyses called for by these two distinct causes of

action.[109]

### 1.    The "Material Differences" Standard

Material differences between authorized and unauthorized goods

created by the same trademark owner exist when the differences between the

goods "create[] . . . confusion over the source of the product and result[] in a loss

of [the trademark owner's] good will."[110]  In these cases, even though the

---

[108]    *See, e.g., Original Appalachian*, 816 F.2d 68; *Warner-Lambert Co. v. Northside Development Corp.*, 86 F.3d 3 (2d Cir. 1996).

[109]    I note that in gray goods cases involving *famous marks*, if infringement is found because material differences likely to cause confusion exist, dilution by tarnishment will likely be found as well.  Nonetheless, courts must still evaluate each claim – for infringement and for dilution – separately, as they are distinct causes of action under the Lanham Act, and situations may arise in which material differences in goods might cause consumer confusion, but not dilution, of the famous mark at issue, and vice versa.

[110]    *Original Appalachian*, 816 F.2d at 73.  In his *Original Appalachian* concurrence, Judge Cardamone pointed out that in most gray goods cases, confusion over the *source* of a product is not a technically accurate description of the sort of confusion that occurs when a consumer is confronted with a gray goods

trademark owner's genuine trademark is attached to the materially different goods,

these goods are not considered "genuine" because they are "confusingly

different."[111] It follows that an action for trademark infringement arises when an

unauthorized seller's actions create a likelihood that consumer confusion, mistake,

or deception will result from the seller's use of a trademark owner's mark "in

connection with the sale, offering for sale, distribution, or advertising of any

goods."[112] If consumers are likely to believe that they are purchasing "genuine"

goods created or endorsed by a particular trademark owner, and the goods they

receive are *not* genuine as a result of material differences between those goods and

authorized goods, then a likelihood of confusion exists, and trademark

---

product. *See id.* at 74-75.  Rather, the "guarantee function" of trademark law –
"that trademark law also serves to guarantee the quality of the trademarked
product" – is the rationale by which consumer confusion can be found in gray
goods cases. *Id.* (citations omitted). Under this rationale, "[w]e have labelled that
control which the [trademark owner] retains 'sponsorship,' and have deemed
confusion as to 'sponsorship' to be confusion as to 'source of origin.'" *Id.* (citing
*Societe Comptoir De L'Industrie Cotonniere v. Alexander's Dep't Stores*, 299
F.2d 33, 35 (2d Cir. 1962)). *See also* 15 U.S.C. § 1125(a)(1)(A) ("Any person
who . . . uses in commerce any word, term, name, symbol, or device . . . which . . .
is likely to cause confusion, or to cause mistake, or to deceive . . . as to the origin,
*sponsorship*, or *approval* of his or her goods, services, or commercial activities by
another person . . . shall be liable in a civil action . . . .") (emphasis added).

[111]     *Original Appalachian*, 816 F.2d at 73.

[112]     15 U.S.C. § 1114(1).

infringement has occurred.  Because "the unauthorized sale of a trademarked

article does not, without more, constitute a Lanham Act violation," the material

differences standard operates to ensure that trademark infringement is only found

in gray goods cases where the "unauthorized sale of a trademarked article" is

likely to cause consumer confusion.[113]

      Courts have found both physical[114] and non-physical[115] material

---

[113]    *H.L. Hayden Co. of New York, Inc. v. Siemens Med. Sys., Inc.,* 879
F.2d 1005, 1023 (2d Cir. 1989).

[114]    The term "physical" refers to tangible product qualities.  *See, e.g.
Bourdeau Bros., Inc. v. International Trade Com'n,* 444 F.3d 1317, 1324 (Fed.
Cir. 2006) (differences in lighting configuration between European and North
American forage harvesters considered material); *Societe Des Produits Nestle,
S.A. v. Casa Helvetia, Inc.,* 982 F.2d 633, 635 (1st Cir. 1992) (holding that
differences in "presentation, variety, composition, and price" between chocolates
bearing the same trademark, but manufactured in different countries were
material); *R.J. Reynolds Tobacco Co. v. Premium Tobacco Stores, Inc.,* No. 99 C
1174, 1999 WL 495145, at *1, *4 (N.D. Ill. July 1, 1999) (differences in
formulation, content, tobacco blends, ingredients, promotions and advertising,
quality control procedures and packaging between domestic and imported
cigarettes considered material); *Duracell Inc. v. Global Imports, Inc.,* No. 83 Civ.
4053, 1989 WL 79721, at *2 (S.D.N.Y. July 10, 1989) (differences in battery life
between domestic and imported batteries considered material).

[115]    *See SKF USA,* 423 F.3d at 1314 ("We hence conclude that . . .
material differences that preclude infringement by gray goods may be physical or
nonphysical.").  The term "nonphysical" here refers to intangible product qualities,
such as accompanying paperwork, service plans or warranties.  *See, e.g., Bourdeau
Bros.,* 444 F.3d at 1324-25 (differences in warning and safety labels, operator
manuals, and service plans accompanying European and North American forage
harvester models considered material); *R.J. Reynolds Tobacco Co.,* 1999 WL

differences to cause consumer confusion and/or loss of goodwill in gray goods

cases. In *Original Appalachian Artworks, Inc. v. Granada Electronics, Inc.*, for

example, the Second Circuit found that a material difference existed between the

trademarked "Cabbage Patch Kids" dolls that were authorized for sale in the

United States and those that were unauthorized because the imported dolls came

with Spanish language "adoption papers" and "birth certificates" that the

American "fulfillment houses" would not process.[116] As a result, the imported

dolls' "adoption" processes could not be completed, and consumers who had

purchased them did not receive birthday cards on their dolls' first birthdays.[117]

The district court held, and the Second Circuit agreed, that because "this adoption

process is an 'important element of the mystique of the [Cabbage Patch Kids]

dolls, which has substantially contributed to their enormous popularity and

commercial success,'" the lack of English-language adoption papers was a

---

49514 at *1, *4 (difference in warranty protection for domestic and imported cigarettes considered material); *Fender Musical Instrs. Corp. v. Unlimited Music Ctr., Inc.*, Civ. A. No. 3:93CV2449, 1995 WL 241990, at *3 (D. Conn. Feb. 16, 1995) (material differences between Japanese-made and American-made electric Fender guitars included lack of warranties and service plans for the Japanese-made models).

[116]     *Original Appalachian*, 816 F.2d at 73.

[117]     *Id.*

33

material difference likely to cause consumer confusion and loss of goodwill to the

trademark holder, even though the dolls themselves were otherwise physically

identical.[118]

In gray goods cases generally, the material differences standard has

been used by courts "as a proxy for the likelihood of confusion test traditionally

used in trademark infringement cases, permitting gray market goods to be sold

unless the goods are 'materially different' from those sold through authorized

distribution channels."[119]  However, because it is "well settled" in this Circuit "that

in cases involving a claim under the Lanham Act the trier of fact must consider

and balance the factors set forth in *Polaroid*,"[120] I see no reason not to consider the

material differences standard in conjunction with the applicable *Polaroid* factors.

### a. Likelihood of Confusion: Applicable *Polaroid* Factors

In gray market cases, the trademark at issue is always plaintiff's

---

[118]     *Id.* at 70 (quoting *Original Appalachian Artworks, Inc. v. Granada Elecs., Inc.*, 640 F. Supp. 928, 930 (S.D.N.Y. 1986)).

[119]     Lynda J. Oswald, *Statutory and Judicial Approaches to Gray Market Goods: The 'Material Differences' Standard,* 95 Ky. L.J. 107, 129-130 (2006-07). *See, e.g., Warner-Lambert*, 86 F.3d 3 (domestic gray goods case); *Polymer Tech. Corp. v. Mimran,* 37 F.3d 74 (2d Cir. 1994) ("*Polymer II*") (same); *Original Appalachian*, 816 F.2d 68.

[120]     *Nikon Inc. v. Ikon Corp.*, 987 F.2d 91, 94 (2d Cir. 1993).

actual mark.  Therefore, neither the strength of plaintiff's mark nor the similarity

between the marks in question (the first two factors) are at issue because the marks

are the same.  Factor three – proximity of the products – is relevant to the issue of

consumer confusion resulting from material differences in gray goods cases, but

factor four – the likelihood that plaintiff will "bridge the gap" – is not, because

plaintiff and defendant are selling the same products to the same market.  With

respect to *Polaroid* factors five through eight – actual confusion between products,

defendant's good or bad faith in adopting the mark, the quality of defendant's

product, and the sophistication of the buyers – each is still highly relevant to the

inquiry into likelihood of confusion resulting from material differences in gray

goods cases.  In fact, the seventh factor – the quality of defendant's product –

should be given more weight in gray goods cases because the crux of the

consumer confusion question in these cases revolves around whether consumers

are likely to be confused by differences between products (often not initially

detectible to the consumer eye) that they presume, understandably, to be of

identical quality because they all bear identical genuine trademarks and are *almost*

the same product.

### b.    Dilution by Tarnishment

Similarly, dilution by tarnishment can be shown within the rubric of

the material differences standard.  When material differences exist between

authorized and unauthorized goods such that "the public is likely to become

confused or deceived as to which characteristics are properly associated with the

trademark," it follows that a likely result of that confusion will be "possibl[e]

ero[sion of] the goodwill of the trademark holder in the United States."[121]  If that

erosion of goodwill amounts to an "association arising from the similarity between

a mark or trade name and a famous mark that harms the reputation of the famous

mark,"[122] then a court may find dilution by tarnishment under the Act.

### c.    Material Differences Threshold

The materiality threshold for establishing material differences in gray

goods cases is low.  In the Federal Circuit, for instance, the materiality threshold

> requir[es] no more than showing that consumers would be likely
> to consider the differences between the foreign and domestic
> products to be significant when purchasing the product, for such
> differences would suffice to erode the goodwill of the domestic
> source.  Indeed, there need only be one material difference
> between a domestic and a foreign product in order to determine

---

[121]    *Bourdeau Bros.*, 444 F.3d at 1320.  *Accord Societe Des Produits Nestle*, 982 F.2d at 636 ("Even if an infringer creates a product that rivals or exceeds the quality of the registrant's product, the wrongful sale of the unauthorized product may still deprive the registrant of [its] ability to shape the contours of [its] reputation.").

[122]    15 U.S.C. § 1125(c)(2)(C).

that the latter is a gray market good eligible for exclusion.[123]

The First Circuit has offered the following explanation for this low threshold of

materiality:

> The probability of confusion is great . . . when the same mark is
> displayed on goods that are not identical but that nonetheless bear
> strong similarities in appearance or function. Gray goods often
> fall within this category. Thus, when dealing with the importation
> of gray goods, a reviewing court must necessarily be concerned
> with subtle differences, for it is by subtle differences that
> consumers are most easily confused. For that reason, the
> threshold of materiality must be kept low enough to take account
> of potentially confusing differences – differences that are not
> blatant enough to make it obvious to the average consumer that
> the origin of the product differs from his or her expectations. [124]

When applying this low materiality threshold, however, courts must

be wary of trademark owners who attempt to "overemphasize differences to obtain

a protection from gray market goods that Congress has not yet been willing to

extend."[125] The Federal Circuit guards against overreaching application of its low

materiality threshold by requiring a plaintiff to "establish that *all or substantially*

*all* of its sales are accompanied by the asserted material difference in order to

---

[123]    *Bourdeau Bros.*, 444 F.3d at 1323 (quotation marks and citations
omitted).

[124]    *Societe Des Produits Nestle*, 982 F.2d at 641.

[125]    Oswald, *Statutory and Judicial Approaches* at 144.

37

show that its goods are materially different."[126]  This is because "if it cannot be

said that substantially all of a trademark owner's goods are accompanied by the

asserted [materially different] characteristic, then it may properly be concluded

that, in effect, there exists no material difference between the trademark owner's

goods and the allegedly infringing goods."[127]  Further, according to the Federal

Circuit, "[t]o permit recovery by a trademark owner when less than 'substantially

all' of its goods bear the material difference from the gray goods thus would allow

the owner itself to contribute to the confusion by consumers that it accuses gray

market importers of creating."[128]

### d.    Examples of Material Differences

### i.    Differences in Packaging

Differences in product packaging have been found to constitute

material differences in a variety of gray goods cases.  In *Davidoff & CIE, S.A. v.*

*PLD International Corp.*, for instance, the Eleventh Circuit found that the

defendant was selling materially different bottles of Davidoff's COOL WATER

fragrance where defendant used an etching tool to remove batch codes from

---

[126]    *Bourdeau Bros.*, 444 F.3d at 1324 (emphasis added).

[127]    *SKF*, 423 F.3d at 1315.

[128]    *Id*.

COOL WATER fragrance bottles.[129]  The etching left "a mark on the bottle near its base on the side opposite the DAVIDOFF COOL WATER printing . . . ."[130]

In *Societe Des Produits Nestle*, the First Circuit found material differences between PERUGINA chocolates manufactured in Italy and PERUGINA chocolates manufactured in Venezuela based on the differences between the chocolates' "boxes, wrappers, and trays."[131]  The Italian boxes were found to "possess a glossy finish" and were colored "either silver, brown, or gold."[132]  By contrast, "[t]he Venezuelan boxes lack[ed] the shiny finish," and "[we]re either blue, red, or yellow in color."[133]  Further, the court found, "[w]hile the Italian sweets [sat] in gold or silver trays, their Venezuelan counterparts rest[ed] on white or transparent trays."[134]  The court also found material differences in the pictures and the language of the descriptions printed on the

---

[129]    *See* 263 F.3d at 1299.

[130]    *Id.*

[131]    *Societe Des Produits Nestle*, 982 F.2d at 643.

[132]    *Id.*

[133]    *Id.*

[134]    *Id.*

chocolate boxes.[135]

In *Lever Bros. Co. v. United States*, the D.C. Circuit found – among other material differences – that differences in the packaging of SUNLIGHT dishwashing liquid meant to be distributed in the United States and SUNLIGHT dishwashing liquid meant to be distributed in the United Kingdom, were material.[136]  The U.S. SUNLIGHT bottles were shaped like an "hourglass," while the U.K. SUNLIGHT bottles were shaped like a "cylindrical drum."[137]  The U.K. SUNLIGHT label displayed different text and graphics than the U.S. SUNLIGHT label, as the former included a "royal emblem, along with the legend 'By Appointment to Her Majesty the Queen.'"[138]

## ii.    Differences in Warranty Protection

Courts have also found that gray goods' lack of warranty protection may constitute a material difference where a trademark owner's authorized goods include warranty protection.  In *Fender Musical Instruments Corp. v. Unlimited Music Center, Inc.*, for example, the defendants – unauthorized FENDER guitar

---

[135]    *See id.*

[136]    *See Lever Bros. Co. v. United States*, 877 F.2d 101, 103 (D.C. Cir. 1989) ("*Lever Bros. I*").

[137]    *Id.*

[138]    *Id.*

40

dealers – imported and sold Japanese-made guitars bearing genuine FENDER trademarks.[139]  Among other product differences, the guitars that defendant sold were not accompanied by the FENDER warranty.[140]  As a result, the court held that, "[b]ecause the Japanese-made products retain Fender's recognized trademarks, consumers would likely be confused that they were buying not just Fender guitars, but also the services and guarantees that usually accompany such a sale.  Thus, the defendants, by selling these Japanese-made guitars, have violated the Lanham Act."[141]

        In *Swatch S.A. v. New City, Inc.*, the court found that although the same warranty accompanied both authorized and unauthorized sales of SWATCH watches, the warranty was void as to the watches sold by the defendant because the warranty expressly stated that it "only comes into force if the warranty certificate is dated, fully and correctly completed and stamped by an official Swatch dealer."[142]  The court held this lack of a warranty, in itself, could constitute a material difference between the goods, and noted that "whether this intangible

---

[139]     1995 WL 241990.

[140]     *See id.* at *3.

[141]     *Id.*

[142]     454 F. Supp. 2d 1245, 1251 (S.D. Fla. 2006).

41

difference [in warranty coverage] is material to a consumer's decision to purchase the watch [*i.e.* is a material difference]" is an issue "of material fact for a jury to decide."[143]

In *Bose Corp. v. Silonsonnic Corp.*, the court found that a triable issue of fact existed as to whether the warranty that accompanied Bose LIFESTYLE home entertainment sound systems applied to LIFESTYLE systems that defendants – non-authorized Bose dealers – sold through the Ebay auction website.[144] The *Bose* court "[a]ssum[ed] without deciding that the lack of an enforceable warranty standing alone is sufficient to render a product inferior for trademark infringement analysis purposes" and therefore could be a material difference.[145]

### iii.    Differences in Quality Control Procedures

The Second Circuit has developed its own body of trademark

---

[143]    *Id.*

[144]    413 F. Supp. 2d 339 (S.D.N.Y. 2006).

[145]    *Id.* at 345. The facts of *Bose* regarding Bose LIFESTYLE systems that were designed for the American market and sold to American consumers by defendants on Ebay differ from the case at bar in one significant aspect. The language of the Bose warranty that accompanied the LIFESTYLE systems stated: "the warranty is transferable if the system was originally purchased from a Bose authorized dealer (and proof of purchase can be provided)." *Id.* at 345-46. In the case at bar, Tempur-Pedic's warranty does not state that it is transferable.

42

infringement law based on a trademark owner's right to control the quality of its goods separate and apart from the material differences theory of infringement used in gray goods cases. However, the two theories work in tandem, because when a trademark owner's product is distributed without the authorization of the trademark owner, differences in quality control procedures may cause consumer confusion between the authorized and unauthorized products. In *El Greco Leather Products Co., Inc. v. Shoe World, Inc.*, the court held that Shoe World had infringed El Greco's trademark in the CANDIES shoe brand when it sold shoes bearing the genuine CANDIES trademark, because those particular shoes had not received "certificates of inspection" from El Greco.[146] The court concluded that because El Greco's inspection procedure was "an integral part of appellant's effort at quality control," the goods were not "genuine" for trademark purposes, and would therefore lead to consumer confusion.[147] The *El Greco* court emphasized that "[o]ne of the most valuable and important protections afforded by the Lanham Act is the right to control the quality of the goods manufactured and sold under the holder's trademark" and that "[f]or this purpose the actual quality of the goods is irrelevant; it is the control of quality that a trademark holder is entitled to

---

[146]     806 F.2d 392, 395 (2d Cir. 1986).

[147]     *Id.*

43

maintain."[148]

In order to succeed in an action for trademark infringement or
dilution based on this quality control theory,[149] however, a trademark owner must
be able to show that it actually follows the quality control procedures it alleges.[150]
In *Polymer Technology Corp. v. Mimran*, the court found that the plaintiff itself
did not always follow the quality control procedures for labeling and tamper-
evident seals that it alleged were violated by defendant, who was an unauthorized
seller of BOSTON contact lens solution.[151]  The court concluded that, "[b]ecause
Polymer essentially admit[ted] that it did not carefully police any procedures it
may have had in place to ensure that the necessary information appeared on
Polymer's packaging, we do not find Mimran's retail distribution . . . even if

---

[148]      *Id.  Accord Polymer II*, 37 F.3d at 78; *Original Appalachian*, 816
F.2d at 75.

[149]      The quality control theory was described by Judge Cardamone in
*Original Appalachian* as the "guarantee function" of trademark law.  *See supra*
note 104.

[150]      *See Polymer II*, 37 F.3d at 79.  A plaintiff is required to "establish
that all or substantially all of its sales are accompanied by the asserted material
difference in order to show that its goods are materially different."  *Bourdeau
Bros.*, 444 F.3d at 1324.  Thus, the Second Circuit's approach to evaluating
whether or not a Lanham Act violation has occurred based on the right to quality
control is essentially the same as the way in which courts limit the material
differences threshold, as explained *supra* at Part IV.C.1.c.

[151]      *Polymer II*, 37 F.3d at 78-79.

violative of FDA regulations, a violation of Polymer's own quality control standards."[152] Further, the court held that "because Polymer itself has no procedures in place to prevent its non-sealed kits from reaching the retail public, it cannot now claim that its trademark was violated because Mimran allowed such product to reach that market."[153]

In *Warner-Lambert Co. v. Northside Development Corp.*, the Second Circuit further clarified the contours of a trademark action based on a trademark owner's right to control the quality of its goods by setting out a three-pronged test that a trademark holder must satisfy in order to succeed under this theory of infringement.[154]  "[T]o be entitled to relief" for trademark infringement, the *Warner-Lambert* court emphasized, "a trademark holder is not required to adopt the most stringent quality control procedures available."[155]  Rather, "[t]he trademark holder must demonstrate only that:  (i) it has established legitimate, substantial, and nonpretextual quality control procedures, (ii) it abides by these procedures, and (iii) the non-conforming sales will diminish the value of the

---

[152]   *Id.* at 79.

[153]   *Id.*

[154]   *See* 86 F.3d at 6.

[155]   *Id.*

mark."[156] This test refines the *Polymer II* standard by recognizing that "[e]ven if

some non-conforming products survive a mark holder's quality control procedures

and enter the marketplace, the sale of additional non-conforming products [by an

unauthorized dealer] could further devalue the trademark," thus still giving rise to

a Lanham Act claim.[157]

 The Second Circuit has not revisited the *Warner-Lambert* test for

infringement based on a trademark owner's right to control the quality of goods

associated with its mark.  When *Warner-Lambert* was decided, the first federal

anti-dilution act had just been passed by Congress.[158]  Since then, Congress has

passed the TDRA, which further clarifies the elements of a trademark dilution

claim.[159]  In light of these changes to federal dilution law, the third prong of the

*Warner-Lambert* test casts trademark actions predicated on differences in quality

control as dilution-based, rather than infringement-based.  The third prong

requires a plaintiff to show that unauthorized sales of goods that do not conform to

the plaintiff's quality control standards or procedures "will diminish the *value* of

---

[156]     *Id.*

[157]     *Id.* at 7.

[158]     The FTDA was passed on January 16, 1996.

[159]     *See* 15 U.S.C. § 1125(c).

[plaintiff's] mark."[160]  Protecting the value of a trademark owner's mark from "negative [consumer] impressions about a mark,"[161] in contrast with protecting against consumer confusion as to source or sponsorship, is the precise basis of an action for dilution by tarnishment under federal dilution law.[162]

### D.    The "First Sale" or "Exhaustion" Defense to Trademark Infringement or Dilution

The "first sale" or "exhaustion" doctrine, as applied in the trademark context,[163] "provides that a distributor . . . has the 'right to resell a branded item in an unchanged state.'"[164]  "The rationale underlying this doctrine is that trademark rights are exhausted once the trademarked goods have been duly placed into the

---

[160]    *Warner-Lambert*, 86 F.3d at 6 (emphasis added).

[161]    *Id.*

[162]    *See* 15 U.S.C. § 1125(c)(2)(C) ("'dilution by tarnishment' is association arising from the similarity between a mark or trade name and a famous mark that harms the reputation of the famous mark.").

[163]    In a recent summary order, the Second Circuit declined to "modify the 'first sale doctrine' in the trademark context into a *per se* rule so that it conforms with copyright's first sale doctrine." *Fendi Adele S.R.L. v. Burlington Coat Factory Warehouse Corp.*, No. 06-1351, 2007 WL 784918, at *1 (2d Cir. Mar. 14, 2007).

[164]    *Original Appalachian*, 816 F.2d at 76 (Cardamone, J., concurring) (quoting 2 *McCarthy* § 25.11).

market."[165]  However, "it is well-recognized that the exhaustion doctrine does not

apply to genuine goods which have been altered."[166]  When trademarked goods are

materially different from the goods that the trademark is known to represent, the

exhaustion doctrine cannot be used as a defense to infringement or dilution.[167]

When unauthorized, down-stream sales of a trademarked item cause consumer

confusion or dilution of a trademark, the purposes of trademark law have been

frustrated, and the trademark owner is therefore entitled to relief.[168]

---

[165]    *Id.*

[166]    *Id.* (citing 2 *McCarthy* § 25.10).  *Accord Polymer Tech. Corp. v. Mimran*, 975 F.2d 58, 61-62 (2d Cir. 1992) ("*Polymer I*") (holding that "[a]s a general rule, trademark law does not reach the sale of genuine goods bearing a true mark even though the sale is not authorized by the mark owner.  Thus, a distributor who resells trademarked goods without change is not liable for trademark infringement." (citations omitted)).

[167]    *See Societe Des Produits Nestle*, 982 F.2d at 638 (holding that "the [exhaustion] maxim does not apply when genuine, but unauthorized, imports differ materially from authentic goods authorized for sale in the domestic market. Thus . . . an unauthorized importation may well turn an otherwise 'genuine' product into a 'counterfeit' one. . . . violat[ing] Lanham Trade-Mark Act section 32 because a difference in products bearing the same name confuses consumers and impinges on the local trademark holder's goodwill.").  *See also Martin's Herend Imports, Inc. v. Diamond & Gem Trading USA, Co.*, 112 F.3d 1296, 1303 (5th Cir. 1997).

[168]    In the copyright context, "[t]he whole point of the first sale doctrine is that once the copyright owner places a copyrighted item in the stream of commerce by selling it, he has exhausted his exclusive statutory right to control its distribution," and therefore a later sale does not frustrate the purpose of copyright law.  *Quality King Distribs. v. L'Anza Research Int'l*, 523 U.S. 135, 152 (1998).  By contrast, when an unauthorized sale of a trademarked product takes place after

Of course, when the re-sale of a trademarked item does *not* cause consumer confusion or dilution of a trademark – even if that re-sale is unauthorized – an action for trademark infringement will not lie. As Justice Oliver Wendell Holmes cautioned in *Prestonettes, Inc. v. Coty*, an early gray goods case, "[w]hen the mark is used in a way that does not deceive the public we see no such sanctity in the word as to prevent its being used to tell the truth. It is not taboo."[169] In *Prestonettes*, the defendant rebottled and resold COTY perfume in smaller bottles.[170] The defendant also took COTY cosmetic power, pressurized it, and "add[ed] a binder to give it coherence and s[old] the compact in a metal case."[171] However, pursuant to a district court decree, the defendant had also placed the following label on the re-bottled perfume: "Prestonettes, Inc., not connected with Coty, states that the contents are Coty's . . . independently rebottled in New York,"[172] and the following label on the cosmetic powder mixture compacts: "Prestonettes, Inc., not connected with Coty, states that the compact of face

_____

the first sale, if that next sale causes consumer confusion or dilution of the trademark owner's goodwill, the purpose of trademark law *is* frustrated.

[169]    264 U.S. 359, 368 (1924).

[170]    *Id.* at 366.

[171]    *Id.*

[172]    *Id.* at 367.

powder herein was independently compounded by it from Coty's . . . loose powder and its own binder . . . ."[173] Also pursuant to the district court decree, "every word [on the labels was] to be in letters of the same size, color, type and general distinctiveness" so as to use plaintiff's trademark only in a descriptive sense, and not in an infringing sense.[174] Justice Holmes held that because the labels were accurate and descriptive, they did not use plaintiff's actual mark in an infringing way, and thus defendant's rebottling of plaintiff's perfume and cosmetic powder did not constitute trademark infringement.[175]

In *Champion Spark Plug Co. v. Sanders*, the Court reaffirmed its holding, emphasizing that under *Prestonettes*, even though "the second-hand dealer gets some advantage from the trade mark," that advantage is "wholly permissible" and does not constitute trademark infringement "so long as the manufacturer is not identified with the inferior qualities of the product resulting from wear and tear or the reconditioning by the dealer. Full disclosure gives the

---

[173]   *Id.*

[174]   *Id.*

[175]   *See id.* at 369 ("If the defendant's rebottling the plaintiff's perfume deteriorates it and the public is adequately informed who does the rebottling, the public, with or without the plaintiff's assistance, is likely to find it out. And so of the powder in its new form.").

50

manufacturer all the protection to which he is entitled."[176]  In order to avoid

infringing the CHAMPION mark, the court required the defendant to include the

following information on all containers, advertising material, and any other papers

relating to its refurbished CHAMPION spark plugs:  "the original make and type

numbers provided it is made clear that any plug referred to therein is used and

reconditioned by the defendants, and that such material contains the name and

address of defendants."[177]

   These words of the Second Circuit in *Champion*, affirmed by the

Supreme Court, are instructive as regards the trademark first sale doctrine and its

limitations.  "It is well settled by the authorities that the defendants have a right to

sell an article manufactured by the plaintiff and to say that it has been so

manufactured by retaining the latter's trade-mark . . . to indicate the origin of the

goods . . . . *They have only to tell the truth, and the whole truth, and to tell it*

---

  [176]  331 U.S. 125, 130 (1947).  The Court limited this holding by noting
that "[c]ases may be imagined where the reconditioning or repair [of a
trademarked product] would be so extensive or so basic that it would be a
misnomer to call the article by its original name, even though the words 'used' or
'repaired' were added."  *Id.* at 129.

  [177]  *Id.* at 128 n.3.

*plainly*."[178] But where a defendant resells a trademarked product under the

manufacturer's trademark and does *not* tell the whole truth so as "to cause

confusion, or to cause mistake, or to deceive"[179] as to the source or sponsorship of

the product, or "to cause dilution by blurring or dilution by tarnishment of the

famous mark,"[180] defendant cannot hide behind the first sale doctrine.

## V.   DISCUSSION

BNB has not satisfied its burden to show that no genuine factual

dispute exists regarding the issues to be decided on this motion for summary

judgment. The record demonstrates that genuine factual disputes exist with

respect to: (1) the availability of Tempur-Pedic's product warranty to consumers

who purchase TEMPUR-PEDIC® mattresses from BNB; and (2) the effect of the

availability of a product warranty on Tempur-Pedic's claims for trademark

infringement and dilution. In other words, Tempur-Pedic has satisfied its minimal

---

[178]    *Champion Spark Plug Co. v. Sanders*, 156 F.2d 488, 491-92 (2d Cir.
1946) (emphasis added). *Accord Bumble Bee Seafoods, L.L.C. v. UFS Indus., Inc.*,
No. 04 Civ. 2105, 2004 WL 1637017, at *3 (S.D.N.Y. July 20, 2004). The *Lever*
Rule used by the Bureau of Customs and Border Protection, described *supra* note
105, reflects the reasoning in *Prestonettes* and *Champion*, and provides a
relatively simple way for sellers of gray goods to avoid Lanham Act violations.

[179]    15 U.S.C. § 1114(1).

[180]    15 U.S.C. § 1125(c)(1).

burden of producing sufficient evidence to raise material issues of fact that must be resolved at trial.[181]

## A.   Availability of Tempur-Pedic's Warranty to BNB's Customers

BNB cannot establish, as a matter of law, that Tempur-Pedic's Warranty applies to BNB's customers for two reasons.[182]  *First*, there are questions of material fact regarding whether BNB's repackaging and shipping procedures void Tempur-Pedic's Warranty.  The Warranty itself provides that "[a]ll warranties contained herein shall not apply if the mattress . . . has been physically abused, damaged, burned, cut or torn."[183]  A question of material fact exists as to whether BNB's repackaging of at least some of Tempur-Pedic's mattresses amounts to "physical abuse" under the Warranty.[184]  An additional question of material fact

---

[181]    I note that plaintiffs have not cross-moved for summary judgment.

[182]    Neither party briefed the question of choice of law.  For the purposes of this motion, I will rely on New York's law of contract interpretation.

[183]    Warranty.  This particular Warranty provision is straightforward and unambiguous.  "'In New York, [] if a contract is straightforward and unambiguous, its interpretation presents a question of law for the court to be made without resort to extrinsic evidence.'"  *LaSalle Bank Nat. Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 205 (2d Cir. 2005) (citing *Postlewaite v. McGraw-Hill, Inc.*, 411 F.3d 63, 67 (2d Cir. 2005)).

[184]    BNB concedes that it does repackage at least *some* of the Tempur-Pedic mattresses it sells."  Reply Memorandum of Law in Further Support of Defendant, Brand Name Beds, LLC's Motion for Summary Judgment ("Reply Mem.") at 1.

53

exists as to whether the "squeez[ing] and fold[ing]" of the mattresses during

shipping, as well as the unwitting attempts by BNB customers to flatten stiffened

Tempur-Pedic mattresses that were shipped in cold weather, cause the mattresses

to be "damaged" under the terms of the Warranty.[185]

      *Second*, Tempur-Pedic contends that, by its terms, the Warranty does

not apply to BNB's customers because the Warranty "is valid only to the original

purchaser of the product," and "[i]f the original purchaser sells the product, the

subsequent purchaser takes the product 'as is' and 'with all faults.'"[186] According

to Tempur-Pedic, the term "original purchaser" refers to "those purchasers who are

able to provide proof of purchase from authorized retailers or Tempur-Pedic

itself," and BNB's consumers are not "original purchasers" by that definition.[187]

BNB, in turn, contends that the term "original purchaser" refers to "the original

'consumer' purchaser and does not apply to retailers who purchase Tempur-Pedic

Swedish Sleep Systems from Plaintiff for resale to consumers."[188]  According to

BNB, because the language of the Warranty does not explicitly state that the

---

[185]     Tarter Decl. ¶¶ 30, 33.

[186]     Warranty.

[187]     Pl. Mem. at 14.

[188]     Def. Mem. at 14.

54

"original purchaser" is someone who has purchased her mattress from an authorized Tempur-Pedic dealer, Tempur-Pedic's argument for its interpretation of its own Warranty is "frivolous."[189]

However, BNB has offered no evidence to support its claim that Tempur-Pedic does not enforce its Warranty in the manner that Tempur-Pedic claims. Andrew Tarter, Tempur-Pedic's Call Center Director for Direct Sales, who has "been in charge of assessing claims made under Tempur-Pedic's warranty,"[190] has declared under penalty of perjury that "[t]o the extent that a Tempur-Pedic product is accompanied by a warranty card, but is not purchased through an authorized retailer or Tempur-Pedic directly . . . no warranty protection is available to the user of the product. Any warranty claim must be accompanied by proof of purchase from an authorized retailer or Tempur-Pedic itself."[191]  At the very least, this conflict over the interpretation of "original purchaser" raises an issue of material fact precluding summary judgment.[192]

---

[189]     Reply Mem. at 8.

[190]     Tarter Decl. ¶ 3.

[191]     *Id.* ¶ 13.

[192]     Under New York law, "when the meaning of the contract is ambiguous and the intent of the parties becomes a matter of inquiry, a question of fact is presented which cannot be resolved on a motion for summary judgment." *LaSalle Bank*, 424 F.3d at 205 (quotation marks and citation omitted).

## B.    Trademark Infringement

A reasonable juror could find that there are material differences between the TEMPUR-PEDIC® mattresses sold by Tempur-Pedic and its authorized dealers and those sold by BNB that present a likelihood of consumer confusion. In addition to the validity of the warranty accompanying BNB's mattresses – which is questionable – a reasonable jury could find that material differences exist in light of the damage that occurs to at least some TEMPUR-PEDIC® mattresses as a result of BNB's repackaging and shipping procedures, which in turn affects the availability of warranty protection. A jury could further find that these material differences are likely to cause consumer confusion under a *Polaroid* factors analysis.

### 1.    The Third *Polaroid* Factor:  Proximity of the Products

BNB sells TEMPUR-PEDIC® mattresses on Ebay, and has perhaps sold TEMPUR-PEDIC® mattresses from its own website – brandnamebeds4less.com.[193]  Both of these websites displayed images of Tempur-Pedic's logo along with images of  TEMPUR-PEDIC® products.[194]  Consumers searching the internet for authorized Tempur-Pedic dealers might type the search

---

[193]    *See* Maluf Aff. ¶¶ 11-14.

[194]    *See id.* ¶¶ 16-18.

terms "Tempur-Pedic," "mattress," and "genuine," into an online search engine

and find BNB's website or Ebay store among the websites returned as a list by the

search engine.  Therefore, a trier of fact could find that "proximity of the

products" tips toward consumer confusion.

> **2.      The Fifth *Polaroid* Factor: Actual Confusion Between the Products**

This factor is neutral thus far, as neither party has presented evidence

of actual consumer confusion.

> **3.      The Sixth *Polaroid* Factor:  Defendant's Good or Bad Faith in Adopting the Mark**

The listings for TEMPUR-PEDIC® products sold from BNB's Ebay

store included the phrases "Brand New," "Never Been Opened," "Authentic," and

"Not a Second."[195]  The listings also included images of the TEMPUR-PEDIC®

design mark and trademark "with the text 'BrandNameBeds4Less' in bold

lettering emblazoned across it, and 'BRANDNAMEBEDS4LESS' placed between

the logo and the Tempur-Pedic instruction to store the mattress 'flat.'"[196]  To the

extent that these images and phrases may have been intended by BNB to mislead

---

[195]     BNB's Ebay Listing for "The ClassicBed by Tempur-Pedic™," Ex. G to Maluf Aff., at 2.

[196]     Maluf Aff. ¶ 18. *See also* Cached Image.

consumers into believing that a connection or sponsorship existed between BNB and Tempur-Pedic, a trier of fact could reasonably find that this factor tips in favor of Tempur-Pedic.

### 4. The Seventh *Polaroid* Factor: The Quality of Defendant's Product

A trier of fact could reasonably conclude that the damage that occurs to TEMPUR-PEDIC® mattresses as a result of BNB's re-packaging and shipping procedures reduces the quality of those mattresses, both in the short and long term. Tempur-Pedic asserts that when a TEMPUR-PEDIC® mattress is subjected to the sort of packaging and shipping procedures used by BNB, "it cannot be expected to function as intended for the life of the warranty."[197]  The terms of the Warranty clearly state that "[a]ll warranties contained herein shall not apply if the mattress . . . has been physically abused [or] damaged."[198]  A trier of fact could reasonably conclude that not only is the product itself, as repackaged and shipped by BNB, inferior to the product packaged and shipped by Tempur-Pedic, but that the product has also lost a valuable intangible component – the twenty year Warranty

---

[197]     Tarter Decl. ¶ 23.

[198]     Warranty.

58

– the absence of which lessens the product's quality as well.[199]  Further, a

reasonable juror could find that – as Tempur-Pedic asserts – its warranty does not

apply to *any* mattress purchased through an unauthorized retailer such as BNB.  In

that case, every TEMPUR-PEDIC® mattress sold by BNB – regardless of whether

it was damaged during shipping – could reasonably be found to be of inferior

quality as compared with the TEMPUR-PEDIC® mattresses sold by Tempur-

Pedic and its authorized dealers.  Therefore, a jury could reasonably conclude that

this factor weighs heavily in favor of Tempur-Pedic.

### 5.    The Eighth *Polaroid* Factor:  The Sophistication of the Buyers

TEMPUR-PEDIC® mattresses sometimes cost over $6,000.[200]  It

would therefore be reasonable for a trier of fact to conclude that most consumers

considering a purchase of a TEMPUR-PEDIC® mattress are sophisticated in that

they would not make the decision to buy such an expensive mattress lightly.

These consumers might also be expected to do a considerable amount of research

into the product that they are buying.  It might be expected that such consumers

---

[199]    *See* Tarter Decl. ¶ 12 ("One of the features that adds such quality and distinctiveness to the Tempur-Pedic brand is the 20-year warranty.  There are few, if any, other mattress and home product manufacturers that provide such extensive warranty protection for their products.").

[200]    *See id.* ¶ 20.

would recognize that a TEMPUR-PEDIC® mattress sold at the discount BNB

provides may not be up to Tempur-Pedic's standards.  However, in the world of

online auction sites and counterfeit sellers, it is difficult for even the most savvy

consumer to avoid the sort of confusion presented by an Ebay store that declares in

bold lettering that its products are "Brand New," "Never Been Opened," and

"Authentic."  Even a sophisticated consumer of luxury mattresses might be

confused, and would certainly feel deceived, when receiving a TEMPUR-PEDIC®

mattress in the mail that – contrary to the statement on BNB's Ebay store – had

been opened and repackaged.  A trier of fact could therefore reasonably conclude

that this factor also tips in favor of likelihood of confusion.

   In conclusion, BNB's motion for summary judgment is denied as to

Tempur-Pedic's trademark infringement claim.[201]  There are differences – in large

part attributable to the likely lack of warranty protection for mattresses sold by

---

   [201]  Even BNB concedes that "should the Court hold that Plaintiffs' Limited Warranty does not cover Tempur-Pedic mattresses sold by Brand Name Beds, summary judgment cannot be granted" because "an examination must be conducted by the Court to determine whether the alleged differences . . . are 'materially different.'  That examination involves questions of fact that cannot be resolved on summary judgment."  Def. Mem. at 16 (citing *Swatch*, 454 F. Supp. 2d at 1521).

BNB[202] – between the TEMPUR-PEDIC® mattresses sold by Tempur-Pedic and

the TEMPUR-PEDIC® mattresses sold by BNB that a reasonable juror could find

material.

### C.    Trademark Dilution

Because a reasonable juror could find actual dilution, and – it follows

– likelihood of dilution, resulting from BNB's unauthorized sales of TEMPUR-

PEDIC® mattresses, BNB's motion for summary judgment on Tempur-Pedic's

dilution claim is also denied.

### 1.    Actual Dilution

BNB sells TEMPUR-PEDIC® mattresses under the identical

TEMPUR-PEDIC® mark used by Tempur-Pedic.  This "identity of marks creates

a presumption of actual dilution."[203]

### 2.    Fame

Drawing all inferences in favor of Tempur-Pedic, a reasonable juror

---

[202]    BNB urges that even if the Court finds that "plaintiffs have raised a disputed issue of material of [sic] fact as to defendant's repackaged goods, this dispute does not extend to mattresses that defendant does not repackage."  Reply Mem. at 7.  I disagree.  Issues of material fact still exist as to (1) whether the Warranty applies to *any* mattresses sold by BNB, and (2) whether BNB only repackages some of the mattresses that it sells.

[203]    *Savin*, 391 F.3d 439 at 453.

could find that the TEMPUR-PEDIC® mark is "widely recognized by the general

consuming public of the United States as a designation of source of the goods . . .

of the mark's owner."[204]  A consideration of the factors suggested by the TDRA

could reasonably support a finding of famousness.  The TEMPUR-PEDIC®

trademark has been registered on the Principal Register of the United States Patent

and Trademark Office since 1994.[205]  Since then, "the duration, extent, and

geographic reach of advertising and publicity of the mark" has been

considerable.[206]  Tempur-Pedic advertises through newspaper and magazine ads,

mailings, television commercials, infomercials, and on the internet.[207]  Tempur-

Pedic "actively" and "continuously" advertises and promotes its products "on a

national level."[208]  As a result, "[t]he brand is a highly regarded, distinctive, and

widely known identifier of high quality, therapeutic mattresses, pillows, pads,

---

[204]     15 U.S.C. § 1125(c)(1)(A).  BNB does not contest the distinctiveness
of Tempur-Pedic's mark.

[205]     *See* Def. 56.1 ¶ 4.

[206]     15 U.S.C. § 1125(c)(1)(A)(i).

[207]     *See* Def. 56.1 ¶ 9.

[208]     Tarter Decl. ¶ 11.

cushions, slippers and other similar products."[209]

The parties have not presented much evidence regarding "[t]he amount, volume, and geographic extent of sales of goods . . . offered"[210] under the TEMPUR-PEDIC® mark.  Nonetheless, Tempur-Pedic alleges that "the goodwill associated with the TEMPUR-PEDIC® trademark has translated into tens of millions of dollars in sales over the years," and that "[i]n the past three years alone, sales of goods bearing the TEMPUR-PEDIC® trademark have exceeded $2 billion."[211]  Further, in addition to general consumer sales, "[a]pproximately 15,000 Tempur-Pedic mattresses are in use nationally at Veteran's Administration facilities, general hospitals, rehab/long-term care facilities, sleep centers and labs and other similar locations for patient use."[212]  Good Housekeeping magazine has "recognized" Tempur-Pedic's mattresses, and Tempur-Pedic has "received awards from Consumers Digest and the Arthritis Foundation."[213]

---

[209]    *Id.*  Further, Tempur-Pedic alleges in its complaint that "[o]ver the last three years, Dan-Foam and Tempur-Pedic have spent in excess of $250 million in connection with their advertisement and promotion of products bearing the TEMPUR-PEDIC® trademark."  Compl. ¶ 12.

[210]    15 U.S.C. § 1125(c)(1)(A)(ii).

[211]    Compl. ¶ 13.

[212]    Tarter Decl. ¶ 9.

[213]    *Id.* ¶ 10.

Even though the parties have not yet offered consumer surveys relating to the "extent of actual recognition of the mark,"[214] based on the evidence currently in the record, a reasonable juror could find that the mark "possess[es] the requisite degree of recognition"[215] necessary to maintain an action for trademark dilution.[216] BNB has certainly not met its burden to prove that no genuine factual dispute exists as to the issue of famousness.

### 3.   Tarnishment[217]

---

[214]   15 U.S.C. § 1125(c)(1)(A)(iii).

[215]   15 U.S.C. § 1125(c)(1)(A).

[216]   I note that neither the TDRA nor the FTDA require a court to consider all of the statutory factors when making a determination of fame, nor do the statutes require a court to use any of the factors listed in either version of the statute if the court finds other factors more relevant. The TDRA simply requires that a mark "possess the requisite degree of recognition," and provides that "the court *may* consider all relevant factors," including the factors listed therein. 15 U.S.C. § 1125(c)(1)(A) (emphasis added). Similarly, the FTDA states that "[i]n determining whether a mark is . . . famous, a court *may* consider factors such as, *but not limited* to" those listed in the FTDA. 15 U.S.C. § 1125(c)(1) (effective until Oct. 5, 2006) (emphasis added).

[217]   In its Complaint, Tempur-Pedic specifies tarnishment as its third cause of action. *See* Compl. ¶ 56. Tempur-Pedic's Complaint also uses the language of dilution by blurring in setting out the elements of its tarnishment claim. *See id.* ¶ 54 ("Defendant Brand Name Beds' commercial use of the TEMPUR-PEDIC® trademark . . . causes, and will continue to cause, the dilution of the distinctive quality of the TEMPUR-PEDIC® trademark."). However, the general tenor of Tempur-Pedic's allegations and evidence suggest that tarnishment more fittingly describes the type of harm Tempur-Pedic alleges. *See id.* ¶ 55 ("More specifically, Defendant Brand Name Beds' use of the TEMPUR-PEDIC®

A question of material fact remains as to whether BNB's actions in selling mattresses bearing the TEMPUR-PEDIC® mark have created an "association" between the mattresses that it sells bearing the TEMPUR-PEDIC® mark and those sold by Tempur-Pedic so as to "harm[] the reputation" of the TEMPUR-PEDIC® trademark.[218]  As described earlier, BNB's repackaging and shipping procedures, as well as the likely unavailability of the Tempur-Pedic Warranty to BNB consumers – either because of those procedures or because BNB is not an authorized Tempur-Pedic dealer – could support a finding of material differences between the mattresses sold by BNB and those sold by Tempur-Pedic and its authorized dealers.

A trier of fact could reasonably find that BNB's "non-conforming sales" of TEMPUR-PEDIC® mattresses "diminish the value of" the TEMPUR-PEDIC® mark, thereby causing harm to Tempur-Pedic's reputation resulting in dilution by tarnishment.[219]  *First*, a jury could reasonably find that Tempur-Pedic

---

trademark has caused . . . the reduction in value of the TEMPUR-PEDIC® trademark because the public will associate the lack of quality and/or prestige in Defendant Brand Name Beds' goods with the Plaintiffs' goods.").

[218]     15 U.S.C. § 1125(c)(2)(C).

[219]     *Warner-Lambert*, 86 F.3d at 6.

has "established legitimate, substantial" quality control procedures.[220]  Tempur-

Pedic maintains an authorized network of retailers to sell its products in order to

ensure that consumers are instructed in the proper use and care of TEMPUR-

PEDIC® mattresses.[221]  Authorized Tempur-Pedic shippers are trained in the

proper delivery and handling of TEMPUR-PEDIC® mattresses.[222]  Tempur-

Pedic's authorized shippers know that "the proper method for storing and

delivering a Temper-Pedic mattress is to lay it flat in its original product

packaging" in order to prevent "permanent[] damage" to the mattress.[223]  These

measures are taken to ensure that the mattresses continue to perform throughout

the duration of the twenty year Warranty.

Whether these procedures are "nonpretextual" raises a question of

material fact.[224]  BNB argues that Tempur-Pedic's quality control procedures are

pretextual because the "Use & Care Instructions" included with TEMPUR-

PEDIC® mattresses state that "'[i]f your mattress is delivered folded during the

---

[220]   *Id.*

[221]   *See* Tarter Decl. ¶ 20.

[222]   *Id.* ¶¶ 22-26.

[223]   *Id.* ¶¶ 22-24.

[224]   *Warner-Lambert*, 86 F.3d at 6.

very cold weather (below 50°F), do not try to force it to lay flat.'"[225]  According to

BNB, this shows that Tempur-Pedic's "own sales literature" takes a view contrary

to that set forth in Tempur-Pedic's Opposition Memorandum, namely that

Tempur-Pedic does, in fact, allow its mattresses to be folded during the delivery

process.[226]  However, Tempur-Pedic offers a believable explanation of this

inconsistency by stating that its mattresses may be folded during delivery only

"briefly, to fit a mattress around a corner or up a staircase," and that the reason

why it is so important that only authorized delivery personnel make these

deliveries is to prevent customers from "trying to pry [the mattresses] flat" if they

have been folded during the course of a cold weather delivery.[227]

    *Second*, a jury could reasonably find that Tempur-Pedic "abides by"

its quality control procedures.  The only evidence – aside from the Use & Care

Instructions – that BNB presents in support of its contention that Tempur-Pedic

does not itself follow its purported quality control procedures is that "plaintiffs

display, sell and deliver mattress *covers* formed of the same 'Tempur' material as

---

[225]    2/15/07 Declaration of Bruce D. Katz, Counsel for BNB ("Katz Decl.") ¶ 4. *See also* Tempur-Pedic Use & Care Instructions, Ex. A to Katz Decl., at 2, ¶ 1.

[226]    Katz Decl. ¶ 5.

[227]    Tarter Decl. ¶¶ 22, 24, 33.

their mattresses in a rolled and/or folded manner."[228]  BNB asserts that this fact

"belie[s]" Tempur-Pedic's assertion that BNB's rolling and folding of TEMPUR-

PEDIC® mattresses damages the "'Tempur' material from which the beds are

made."[229]  A jury could reasonably conclude that there is a difference between the

quality control procedures that Tempur-Pedic follows for its mattresses and

mattress covers, and that evidence showing that Tempur-Pedic's travel mattress

covers are meant to be rolled does not prove that Tempur-Pedic does not follow

quality control procedures meant to prevent its mattresses from being rolled.  At

the very least, this presents a genuine factual dispute rendering summary judgment

for BNB inappropriate.

   *Third*, if the jury finds that Tempur-Pedic does in fact abide by the

legitimate and substantial quality control procedures that it has in place, and that

these procedures are nonpretextual, the jury could also reasonably conclude that

BNB's mattress sales "will diminish the value" of the TEMPUR-PEDIC® mark,

---

[228]  Katz Decl. ¶ 6 (emphasis added).  *See also* 2/15/07 Image and
Website Listing for Tempur-Pedic® Mattress Overlay, *available at*
http://www.tempurpedic.com/TempurCMSVB/comfort/mattressoverlays, Ex. B to
Katz Decl., at 1.

[229]  Katz Decl. ¶ 6.

thus diluting the TEMPUR-PEDIC® trademark by tarnishment.[230]  Consumers who purchase TEMPUR-PEDIC® mattresses from BNB expecting that they are buying the product that they have come to associate with the TEMPUR-PEDIC® trademark might well form negative opinions of the TEMPUR-PEDIC® mark when the product that they receive is of considerably lesser quality than those sold by Tempur-Pedic and its authorized dealers.  If the jury so finds, this is exactly the sort of injurious use of a trademark that "harms the reputation of the famous mark" against which federal dilution law was meant to protect.[231]

### D.    The "First Sale" Doctrine

The first sale doctrine only ensures that an unauthorized distributor of a trademarked item is not liable for trademark infringement or dilution when the distributor "resell[s] a branded item in an *unchanged* state."[232]  Because I cannot say, as a matter of law, that there are no material differences between the mattresses sold by BNB and those sold by Tempur-Pedic, the first sale doctrine cannot bar Tempur-Pedic's claims.

---

[230]    *Warner-Lambert*, 86 F.3d at 6.

[231]    15 U.S.C. § 1125(c)(2)(C).

[232]    *Original Appalachian*, 816 F.2d at 76 (Cardamone, J., concurring) (emphasis added).

69

BNB itself recognizes that

> an "unauthorized" dealer is not liable under any trademark theory for obtaining genuine trademarked goods from plaintiffs' authorized dealers and selling them by mail order without the plaintiff's authorization, even where the goods are sold without the plaintiff trademark owner's warranty – *provided that purchasers are not misled* about the warranty service, and provided there is no suggestion that the manufacturer's warranty applies or that such a sale was authorized by the plaintiff.[233]

There are genuine issues of material fact relating precisely to the issue of the

Warranty, and whether BNB has done more than simply engage in the

"unauthorized sale of a trademarked article."[234] A jury could reasonably conclude

that BNB's actions as a second-seller of TEMPUR-PEDIC® mattresses do not

"tell the truth, and the whole truth . . . plainly" as to the sponsorship of the

mattresses that it sells.[235] If a jury finds that there are material differences between

the mattresses sold by BNB and those sold by Tempur-Pedic and its authorized

dealers, and further finds that those material differences present a likelihood of

consumer confusion or trademark dilution, then the first sale doctrine cannot

provide a defense for BNB.

---

[233]    Def. Mem. at 12 (emphasis added).

[234]    *H.L. Hayden*, 879 F.2d at 1023.

[235]    *Champion*, 156 F.2d at 491-92.

**E.      Claims of Trademark Infringement and Unfair Competition Under New York General Business Law §§ 349, 350 and 360-l**[236]

The parties have not fully briefed Tempur-Pedic's claims under the New York General Business Law.  Further, as BNB has not met its burden to prove that no issue of material fact remains as to Tempur-Pedic's claims of trademark infringement and dilution under the Lanham Act, the same result is required for the corresponding claims under New York law.[237]

## VI.   CONCLUSION

For the foregoing reasons, defendant's motion is denied.  The Clerk of the Court is directed to close this motion (Docket No. 11).  A conference is scheduled for May 9, 2007 at 1:30 P.M.

-----

[236]      Plaintiffs' claim for tortious interference with existing contractual relations cannot be addressed at this time as defendant has not yet disclosed the source of its goods.

[237]      I note that to the extent that Tempur-Pedic seeks prospective relief under the TDRA, the primary difference that formerly existed between dilution claims under the Lanham Act and dilution claims under § 360-l is now gone, because the TDRA has replaced the *Moseley* "actual dilution" standard with a "likelihood of dilution" standard.  The standard under § 360-l has always been "likelihood of dilution."  *See, e.g., Louis Vuitton*, 454 F.3d at 119 ("The New York standard . . . requires a showing of a mere 'likelihood of dilution.'") (citation omitted).  The Second Circuit has recently cautioned, however, that "it is not clear that [New York Gen. Bus. Law § 360-l] is coextensive with the [TDRA]." *Starbucks*, 477 F.3d at 766.

71

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:     New York, New York
           May 4, 2007

## -Appearances-

**For Plaintiffs:**

Edward F. Maluf, Esq.
Bingham McCutchen LLP
399 Park Avenue
New York, New York 10022
(212) 705-7000

**For Defendant:**

Bruce D. Katz, Esq.
Bruce D. Katz & Associates
The Transportation Building
255 Broadway, 37th Floor
New York, New York 10007
(212) 233-3434